UNITED STATES *v.* EQUITABLE TRUST COMPANY OF NEW YORK ET AL.

No. 21. Argued December 1, 2, 1930.—Decided June 1, 1931.

*Assistant Attorney General Richardson,* with whom *Attorney General Mitchell* and *Messrs. Nat M. Lacy* and *Pedro Capo-Rodriguez* were on the brief, for the United States.

*Mr. John W. Davis* argued the cause and filed a brief for respondents. *Messrs. Carroll G. Walter, Rayburn L. Foster, Almond D. Cochran,* and *Harrison Tweed* also filed briefs for respondents.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This writ brings under review a supplemental decree making allowances for attorney fees, expenses, etc., in a suit, instituted by a next friend, to recover and preserve a trust fund belonging to Jackson Barnett, an incompetent Creek Indian, and directing that the allowances be paid from that fund. The allowances are challenged by the United States as in conflict with existing restrictions on the disposal of the trust fund, and as excessive.

Barnett is a full-blood Creek Indian, so enrolled, who received an allotment out of the Creek tribal lands when they were divided in severalty pursuant to congressional

legislation.[1]  By that legislation and an amendatory act [2] his right and title under the allotment and the ensuing patent were subjected to restrictions against " alienation, contract to sell, power of attorney, or any other encumbrance " prior to April 26, 1931,[3] save in virtue of a full or partial removal of the restrictions by the Secretary of the Interior, and against leasing for oil, gas or other mining purposes, save with the approval of that officer.

In 1912 the probate court of the county of Barnett's residence, in Oklahoma, adjudged him a mental incompetent and appointed a guardian of his estate.  Later in that year Barnett and the guardian (the former described as " an incompetent,") with the approval of that court and of the Secretary of the Interior, executed to one Bartlett an oil and gas lease of the land allotted to Barnett.  The lease required that the royalties be paid to a local representative of the Secretary of the Interior and held for Barnett's benefit.

Royalties came in rapidly.  In 1920 they had produced in the hands of the Secretary's local representative a fund of about $1,000,000, after various small sums had been turned over to the Oklahoma guardian for Barnett's support.  Near that time the accumulated fund was taken over by the Secretary, invested in U. S. Liberty Bonds and held by him for Barnett's use.

News of Barnett's wealth became widespread and, thereafter, as was found by the district court, he was kidnapped by an adventuress who took him to two States other than that of his residence and had him go through a marriage ceremony with her in both; was harassed and annoyed by her attorneys and their allies; and on De-

---

[1] Acts March 1, 1901, c. 676, 31 Stat. 861, and June 30, 1902, c. 1323, 32 Stat. 500.

[2] Act May 27, 1908, c. 199, 35 Stat. 312.

[3] Extended to April 26, 1956, by Act May 10, 1928, c. 517, 45 Stat. 495.

cember 15, 1922, was induced by them to put his thumb mark upon an instrument, not understood by him, requesting the Secretary of the Interior to distribute the greater part of the trust fund in the latter's custody by giving $550,000 in Liberty Bonds to the wife, and a like sum in such bonds to the American Baptist Home Mission Society on condition that it pay for his use $20,000 a year during the remainder of his life. Barnett was then about 73 years of age and the designated annuity was less than the yearly interest on the bonds to be given to that society.

On February 1, 1923, the Secretary of the Interior approved that instrument, and soon after approving it he distributed the $1,100,000 in Liberty Bonds as requested.

After the distribution was effected the wife took Barnett to California, and on her application a court of that State, in 1924, adjudged him an incompetent, incapable of caring for his person or estate, and appointed a guardian.

The Oklahoma guardian, on learning of the distribution, invoked the assistance of reputable attorneys with a view to asserting and protecting Barnett's interest in the bonds thus separated from his trust fund. These attorneys acquainted themselves with Barnett's mental incompetency and the other facts bearing on the validity of the distribution, brought the facts to the attention of the Secretary of the Interior and earnestly and repeatedly requested that officer to take steps to secure a restoration of the bonds to the trust fund. The Secretary declined to take such action, insisted the distribution was valid and must stand, and refused to permit any moneys under his control and belonging to Barnett to be used in an effort to recover the bonds. The attorneys then laid the matter before the Department of Justice and urged the institution of suits on the part of the United States for the revocation of the distribution and the return of the bonds,

but this request, like that to the Secretary of the Interior, failed.

Thereafter, on January 22, 1925, the attorneys brought a suit in equity in the name of Barnett, by Elmer S. Bailey as next friend, against the American Baptist Home Mission Society and others to cancel the gift to that society and to protect and preserve Barnett's interest in the bonds so given and the income therefrom. Bailey, the next friend, was the Oklahoma guardian who had invoked the assistance of the attorneys. The suit was brought in the United States District Court for the Southern District of New York. Other suits relating to the other bonds were brought elsewhere, but they are without bearing here.

After the suit was begun the Secretary of the Interior continued to oppose the effort to annul the distribution—and this notwithstanding he was advised in a letter of February 9, 1925, from the then Attorney General, Mr. Stone, to whom he had stated his opposition two days before, that the distribution appeared to be entirely unauthorized and that the Government was in duty bound to use its best efforts to assist in recovering the bonds. Mr. Stone retired from the office of Attorney General soon after the date of that letter, and thus was unable to carry his view into effect.

On January 20, 1926, the succeeding Attorney General, at the solicitation of the next friend and his attorneys, sought and obtained leave for the United States to intervene in the suit and thereby participate in the effort to effect a recovery of the bonds and their income for Barnett's benefit. After the intervention was accomplished the attorneys for the next friend and the solicitors for the United States harmoniously prosecuted the cause to a successful conclusion. All rendered commendable service, but in many particulars the leading part and major burden fell to the attorneys for the next friend.

On the final hearing the court found that Barnett was illiterate and so stunted and undeveloped mentally that he was incapable of managing his own affairs or of understanding a transaction like the one in question; that the wife and her attorneys and allies, with selfish motives, induced him to place his thumb mark on the instrument requesting the distribution; and that he did this without any real comprehension or knowledge of what he was doing. The court also ruled that the Secretary of the Interior could not by his approval give validity to a gift which the apparent donor by reason of mental incompetency was incapable of understanding or making; that the defendants, although blameless, acquired no property or beneficial interest through the purported gift and must be regarded as holding the bonds and the income therefrom as the property of Barnett; and that as the bonds were wrongly taken from the trust fund in the custody of the Secretary of the Interior, they and the income from them (less such allowances as the court should require to be paid therefrom for services and disbursements connected with the recovery) should be restored to that fund and there held for Barnett agreeably to applicable laws of Congress.[4] A decree to that effect was entered and an attempted appeal by one of the defendants proved of no avail.[5]

The court later on, pursuant to a reservation in the decree, took up the question of what, if any, allowances should be made for services and disbursements. Applications for such allowances were made by the attorneys for the defendants, by the next friend and by his attorneys. All were opposed by the United States. The court rejected the application of the attorneys for the defendants and by a supplemental decree allowed to the next friend $7,500 for his services and allowed to his at-

---

[4] 21 F. (2d) 325.    [5] 26 F. (2d) 350; 278 U. S. 626.

torneys $184,881.08 for their services and $4,282.93 to reimburse them for out-of-pocket expenses. There were also directions that these allowances be paid out of the fund which had been the subject of the litigation and that the fund as thus reduced be restored to the custody of the Secretary of the Interior conformably to the prior decree. On an appeal by the United States the Circuit Court of Appeals reduced the allowance for the services of the attorneys for the next friend to $100,000 and sustained the other allowances.[6] This Court then granted a petition by the United States for a further review on a writ of certiorari.

It is a general rule in courts of equity that a trust fund which has been recovered or preserved through their intervention may be charged with the costs and expenses, including reasonable attorney's fees, incurred in that behalf; and this rule is deemed specially applicable where the fund belongs to an infant or incompetent who is represented in the litigation by a next friend. " Such a rule of practice," it has been said, " is absolutely essential to the safety and security of a large number of persons who are entitled to the protection of the law—indeed, stand most in need of it—but who are incompetent to know when they are wronged, or to ask for protection or redress." [7]

Counsel for the United States concede the general rule, but regard it as inapplicable here. They assume that Barnett's fund was restricted in the sense that it was not subject to disposal in any form or for any purpose, save with the approval of the Secretary of the Interior; and from this they argue that the court, by charging the fund with the costs and expenses and requiring their payment therefrom, would be disposing of a part of the fund in violation of applicable restrictions.

---

[6] 34 F. (2d) 916.

[7] 36 N. J. Eq. 456, 458; 1 Daniell's Chancery Pl. & Pr., 6th Am. ed., *pp. 69, 79. And see *Trustees* v. *Greenough*, 105 U. S. 527, 532, *et seq.*; *Central Railroad & Banking Co.* v. *Pettus*, 113 U. S. 116, 123.

We make the assumption that the restrictions had substantially the same application to the fund that they had to the land from which it was derived, but we think the argument carries them beyond their purpose and the fair import of their words. Without doubt they were intended to be comprehensive and to afford effective protection to the Indian allottees; but we find no ground for thinking they were intended to restrain courts of equity when dealing with situations like that disclosed in this litigation from applying the rules which experience has shown to be essential to the adequate protection of a wronged *cestui que trust*, such as Barnett was shown to be.

The refusal of the Secretary of the Interior, and the failure of the Department of Justice, to take any steps to correct the wrong amply justified the institution, in 1925, of the suit in the name of Barnett by the next friend. The United States intervened only after the suit had proceeded for a full year. Its purpose in intervening, as shown by the record, was not to supplant or exclude the next friend and his attorneys, but to aid in establishing and protecting Barnett's interest in the fund in question. In its petition of intervention it prayed that this fund "after deducting the reasonable expenses of this litigation" be restored to the custody of the Secretary of the Interior. Later on it acquiesced in an order allowing the next friend's attorneys $3,000 from the fund to meet expenses about to be incurred. In all the proceedings which followed the intervention it coöperated with the next friend to the single end that the diverted fund be recovered for Barnett's benefit. And both were satisfied with the main decree when it was rendered.

When all is considered, we are brought to the conclusion that the United States by its intervention and participation in the suit consented, impliedly at least, that reasonable allowances be made from the fund, under the

rule before stated, for the services and expenses of the next friend and his attorneys.[8]

We come then to the question whether the allowances were excessive. Counsel for the United States now confine their criticism to the one for the attorneys' services.

The District Court apparently included some services in other litigation, particularly in Oklahoma. But the Circuit Court of Appeals excluded them, and we think its action was right. The nature of the other litigation was such that it could neither disturb the prosecution of this suit nor affect the outcome.

While the Circuit Court of Appeals reduced the allowance to $100,000, it stated that $50,000 would have been enough but for the hazard. We think the hazard was small and that the allowance should have been $50,000. The material facts were few and demonstrable; and the applicable legal principles were fairly certain. Of course, there was need for intelligent research and action; but otherwise there was not much hazard. While the record shows that these attorneys did their part well, it also shows that, after the intervention of the United States, the attorneys of the latter contributed much helpful service. The fund which was recovered was large, and of course this had a bearing on what was reasonable, but it gave no license to go further.

The fund belonged to an Indian who was mentally incompetent. He had no voice in selecting the attorneys and could have none in fixing their fees. Thus, justice to him required that special care be taken to confine the fees to what was reasonable. And by applying that standard, justice would also be done to the attorneys.

As before indicated, we think the allowance of $100,000 unreasonably high and that to bring it within the standard of reasonableness it should be reduced to $50,000.

---

[8] *The Siren*, 7 Wall. 152, 154; *United States* v. *The Thekla*, 266 U. S. 328, 339–340. And see *New York Dock Co.* v. *The Poznan*, 274 U. S. 117, 121.

The supplemental decree is modified accordingly and as so modified is affirmed.

*Decree modified and affirmed.*

MR. JUSTICE STONE did not participate in the consideration or decision of this case.