**UNITED STATES v. McGUGIN et al.**
No. 293.

District Court, D. Kansas, Third Division.
Feb. 3, 1940.

S. S. Alexander, U. S. Atty., and R. T. McCluggage, Asst. U. S. Atty., both of Topeka, Kans., and Charles E. Collett, of Washington, D. C., for the United States.

Howard T. Fleeson and Wayne Coulson, both of Wichita, Kan., and W. L. Cunningham and D. Arthur Walker, both of Arkansas City, Kan., for defendants.

HOPKINS, District Judge.

The action is one by the United States for the benefit of Jackson Barnett, a full blood Creek Indian and an enrolled member of the Creek Tribe, to recover $137,500 paid to the defendant Harold C. McGugin for services as attorney for the wife of Barnett. This sum was paid McGugin by Mrs. Barnett from a much larger sum received by her in a division of money, all of which was wrongfully withdrawn from funds credited to Barnett with the Treasurer of the United States.

A review of the craft and machinations brought into play by otherwise disinterested parties in dividing up this wealth of the incompetent Indian fully exemplifies the Biblical saying that "The love of money is the root of all evil."

The chief actors, some on the stage and some behind the scenes, included Anna Laura Lowe, an adventuress who dealt in oil leases, keen and vigorous, and anxious for wealth for herself from the flush oil lands of Oklahoma; Harold C. McGugin, energetic, brilliant minded young lawyer, whose talents would have carried him to

high place except for this unfortunate performance; Albert B. Fall, Secretary of the Interior; A. J. Ward, attorney for the Creek Indians; M. C. Mott, an Oklahoma lawyer; Carl J. O'Hornett, guardian; and others representing the Indian through the Indian agencies and Interior Department. A cast of fine ability, possessed of unusual talents, and all actuated by a positive and sincere urge to make the show a success. Jackson Barnett, unconcerned and alone in the center of the stage commanded the spot-light in this tragic farce, a befuddled, bewildered performer who did not realize that his illuminated position was a lure to the other actors. "Crazy Jack," as the bulky Indian was known to many, required some prompting, although his lines were simple and well suited to the role he was destined to play. When spoken to, he would grin or smile vacantly and respond with a grunt.

The Indian was domiciled in the state of Oklahoma and there received, when tribal lands were allotted to the individual members of the Creek Tribe, a certain parcel of land to be owned in severalty. He was a ward of the federal government and, under Acts of Congress, restricted in any independent disposition of his property. While he owned the land and in the year 1912, he was adjudged by the probate court of the county of his residence, a mental incompetent, and a guardian of his estate was appointed.

The guardian, with authority from the probate court, leased Barnett's lands for oil, the lease being approved, as it was required to be, by the Secretary of the Interior. The lease provided for the payment of royalties to the representative of the Secretary of the Interior. In the year 1920, the returns from those royalties had reached a sum in excess of $1,000,000 the disposition of which occasioned this and many other court trials.

The guardian Carl J. O'Hornett purchased a tract of about thirty acres of rough, timbered land about eleven miles northwest of the town of Henryetta, in Okmulgee County, Oklahoma, and caused to be constructed thereon a simple, four-room house, without conveniences, as a residence for Barnett. Two or three negroes were there to serve and care for Barnett, but little more was done for his comfort, and slight precautions were taken for his protection against imposition.

The oil royalty proceeds were invested largely in government bonds and were deposited with the Secretary of the Interior and later with the Treasurer of the United States. Barnett's wealth grew and became the subject of comment.

Barnett was sixty-six years old in 1920 when he first met Mrs. Lowe. Anna Laura Lowe had read in an oil journal mention of Barnett as the richest Indian in the Country. She was dealing in oil leases, and she testified she planned to see him, intending to negotiate a lease. At any rate, it appears in January, 1920, she arrived at Henryetta, Oklahoma, close to which town Jackson lived. Mrs. Lowe related in her testimony (testimony at another trial but in evidence here) that on her first visit Jackson had said a missionary had told him he ought to have a wife, and he would like her to marry him and that she had replied, "All right, Jackson, I will think about it." On January 30, 1920, she called again at Jackson's place in an automobile with a driver. She found the Indian in his living room and told him that she had come to get married. Jackson entered the automobile, and at Mrs. Lowe's direction, they went to Okemah, the county seat of a nearby county. The clerk there refused to issue a marriage license, and the couple were then driven to Holdenville, another county seat in Oklahoma, and again a marriage license was refused Mrs. Lowe. They were out all night on this trip, after which Jackson was returned to his home near Henryetta. O'Hornett, the guardian, visited her at her hotel and tried (as she testified) to "discourage me in marrying;" that she informed the guardian, "I am leaving on the morning train and am coming back and Jackson and I are going to get married and you nor anyone else can prevent it." She left for Kansas City immediately and three weeks later returned to Oklahoma, going first to Tulsa, seventy-five miles from Henryetta. Mrs. Lowe was acquainted with Alvin L. Moorehead, who had a business office in Tulsa. She employed him to drive her to Barnett's place, and they arrived there about dusk. Barnett came down to the car. He had no shoes, coat or hat. As he approached the car Mrs. Lowe got out and threw her arms around his neck. She asked him to get into the car, and he did so. A colored person brought Jackson's shoes, hat and coat. Jackson put on his coat, got back in the car, and the party drove to Tulsa. Mrs. Lowe rode on the back seat with Jackson.

She talked to him and suggested, "Let's get married," and "We are going to get married." He would grunt but make no other reply. From Tulsa, they drove to Coffeyville, in Montgomery County, Kansas. She went to the Probate Judge of that county at Independence, obtained a marriage license, returned to Coffeyville, and there a justice of the peace was procured to perform a marriage ceremony. The woman took legal advice at Coffeyville from the defendant McGugin, who continued as her adviser from that time on.

McGugin and Keith, his partner, immediately began rendering services to Mrs. Barnett. They prevented Barnett being removed from her custody. McGugin apprehended that the marriage ceremony at Coffeyville might be held invalid. He ascertained from a lawyer in Neosho, Missouri, in the southwestern part of that state, what the law of Missouri was upon the question of the marriage of an incompetent under guardianship. He advised Mrs. Barnett to have a second marriage performed in Missouri. He went to Neosho with Mrs. Barnett, taking Barnett with them. She obtained a marriage license from the Probate Judge there, and a second marriage ceremony was performed by the Probate Judge of Newton County, Missouri. This was about February 27, 1920.

A few days later, March 1, 1920 Mrs. Lowe entered into a contract with McGugin's law firm, Keith & McGugin, retaining them as her legal counsel in "upholding the validity of her marriage with Jackson Barnett" and in effect to assist her in obtaining his property. She agreed therein to pay McGugin twenty-five percent of all monies and property which she received from Barnett, such twenty-five percent not to exceed $500,000. She further agreed never to consent to Barnett's disposition by gift or will of more than one-half his property.

McGugin's devotion to the case and actuation by hope of reward is indicated by his statements a few weeks later to Moorehead, who had gone to Coffeyville at Mrs. Barnett's request. Moorehead saw Mrs. Barnett at a hotel. She told Moorehead there was quite a mixup as the guardian had been up there for Jackson. She said she had employed an attorney and telephoned and McGugin came over. McGugin said he was taking care of them and that they had to arrange some way for an In-

dian baby (this apparently because it was assumed the white woman could not inherit). He talked with McGugin at his office, both then went to the hotel where McGugin gave a secret knock, and Mrs. Lowe opened a little crack of the door. Asked why so much secrecy, McGugin said, "We got to keep him guarded or the old son of a gun will run off." After leaving the hotel, McGugin said, "We are going to be rich * * * when the old man dies." Moorehead said, "These Indians never die, some of them live for centuries," and McGugin responded, "I won't let the old son of a gun live more than five years."

During all these times, Jackson Barnett was mentally incompetent and did not realize what he was doing. He did not know what the marital obligation meant. The county clerk who refused him a marriage license at Holdenville, Oklahoma, who was himself a Creek, so testified. He gave Barnett's mentality as that of an eight year old child. Witnesses who were well informed generally, knew the Creek Indians and their language and Barnett personally, have testified in substance that in 1900 when the town of Henryetta was started Jackson was there; that Jackson was friendly and often asked for a nickel or a dime for tobacco but that when engaged in conversation, he would not respond but just grin with a blank, vacant expression; that usually he would be standing leaning against a wall; that his behavior was contrary to that of full blood Creeks, as they would mingle with one another and with white people and talk and laugh; that Barnett was nearly always alone; that Jackson, when about 25 years old, at one time had fallen from a horse and hit his head on a stump and cracked the bones on one side; that before the injury Barnett would talk and have fun; that after the injury, he would stand around by himself and the other Indians called him "Witchcraft;" that he never acted the same after his injury; that he did not seem to have good sense; that his skull had been cracked; that when he came in at the time his head was bloody; that after that he would stay out in the woods, at first was nearly blind; that he wouldn't talk sense; that whatever was spoken to him he would usually repeat; that at times he would stand in the road, at one side, where he would stand and grin, and would not move for vehicles; that when spoken to, "Hello Jack," Jackson would repeat in reply,

"Hello Jack;" and that he would stand by the hour at a window or against a wall on the streets of Henryetta.

Barnett was called to the witness chair before Federal Judge James in California, and Judge James said of him, "He appeared to be a simple old Indian of gentle disposition, unconcerned with what was going on about him. He seemed to be familiar with the English language in so far as he spoke at all, but his whole appearance, demeanor and responses were of a character that fully met the description given by the various witnesses. It is plain beyond words that this old man could have no comprehension of the marriage contract or of any of the obligations which the marriage relationship imposes. He spoke not at all of Mrs. Lowe as his wife but in one instance referred to her as 'the woman.' "

Barnett and "the woman" remained in Kansas awhile but a habeas corpus suit was brought by the guardian for his return to Oklahoma, which resulted in an arrangement whereby they returned to Barnett's home in Oklahoma. The four-room house and its furnishings were somewhat improved, and they resided there for a brief time. They then moved to Muskogee, where they remained until 1923 they removed to Los Angeles, California, where Mrs. Lowe-Barnett eventually built a pretentious mansion on one of the principal boulevards of the city of Los Angeles and there lived with Barnett until his death, May 29, 1934. Her daughter by a former marriage, Maxine Sturgess, lived with them.

It is quite beside the issues here, but it may be said that thus transplanting the Indian from the environment to which he was from boyhood accustomed, away from people of his own kind, his ponies, and the country life to which he was accustomed, was not to his betterment, nor did it contribute to his contentment. At one time, after Barnett was brought to Los Angeles, officers were sent to take him to Oklahoma as a witness. Barnett seemed pleased to be back in his old home when the party arrived there. But Mrs. Lowe followed immediately and again took charge of him and returned with him to Los Angeles, where he lived in the elaborate residence, rode in a limousine with a chauffeur, and at times stood on the street corner attempting in a childish way to direct automobile traffic.

McGugin, under his contract, rendered able and efficient services to Mrs. Barnett. This required much time and work, and the value of the services was large. He obtained substantial sums of money for living expenses for the Barnetts, as a result of which Jackson was neatly dressed, his mode of life was made more comfortable, and he received medical and hospital care and shared in the advantages derived from the expenditures of his funds.

It was McGugin's energy and planning that resulted in the withdrawal of Barnett's funds and payment of a portion to Mrs. Barnett. Amasa J. Ward, formerly of Washington, was the attorney for the Creek Tribe and was stationed at Muskogee in Oklahoma. McGugin and Mrs. Barnett procured Ward's active cooperation. A plan was suggested to and entertained by him for a gift of a part of the estate of Barnett to the American Baptist Home Mission Society, in trust for the benefit of Indian University, known as Bacone College, a school for Indians, and the Murrow Indian Orphans Home, both located at a place called Bacone near Muskogee. It appeared that the Indians who would receive training and education at these two institutions would be benefitted by a large gift in trust for the institutions. The plan was discussed by Ward with the Commissioner of Indian Affairs (Burke), and with McGugin, Keith and Mrs. Barnett. Mrs. Barnett and McGugin insisted that if such a trust be established, she at the same time be given a share of Jackson Barnett's estate. Ward suggested $700,000 be placed in the trust and $400,000 be given to Mrs. Barnett. Mrs. Barnett and McGugin objected to that division and demanded that Mrs. Barnett be given an equal sum to that which would be placed in the trust. To this demand, Ward assented. These negotiations were conducted during the fall of 1922, part of them at Washington.

Most of the royalties from the oil and gas lease had been invested, by direction of the Secretary of the Interior, in United States bonds, and those bonds deposited with the Secretary of the Treasury. There had been deducted some expenses for the maintenance of Barnett and afterwards for the maintenance of Mr. and Mrs. Barnett, as well as some guardian and county court expenses. In the fall of 1922, the amount on deposit with the Secretary of the Treasury was over $1,100,000, and at the end of

January, 1923, it was $1,156,250. There were also some royalty funds to the credit of Barnett held elsewhere of over $130,000. It was finally arranged between Ward, McGugin and Mrs. Barnett that $550,000 of the funds deposited with the Treasurer should be withdrawn and deposited in the trust with the American Baptist Home Mission Society, and that $550,000 of the funds should be delivered to Mrs. Barnett.

In November, 1922, McGugin conferred with Ward in Washington. The plan for the distribution was beginning to take shape, and at McGugin's request, Mrs. Barnett came to Washington bringing with her Jackson Barnett. Keith also was there. The negotiations proceeded; discussions were had upon the subject between Mrs. Barnett, McGugin, Keith, and Ward. When the plan was substantially determined, Jackson Barnett was informed of it, and a purported oral consent was drawn from him.

Ward consulted with the Commissioner of Indian Affairs about the negotiations, with an Assistant Secretary of the Interior about the project and with an attorney of the Interior Department and some attorneys in the Indian Division on some legal questions presented. The Commissioner approved the plan before it was put in writing.

A document was prepared by Ward, dated December 15, 1922, which purported to be a request by Jackson Barnett to the Secretary of the Interior through the Commissioner of Indian Affairs, setting out the distribution plan and asking its approval. Jackson Barnett was induced to place his thumb print at the foot of this document to attest his signature which had been written there by someone else. After the preparation of this pretended request, there were some slight changes made as to how the trust deposit should be handled. This document contained at the end of a statement signed by Mrs. Barnett, reciting her consent to the plan.

The request and the letter were delivered to the Commissioner of Indian Affairs, who in turn transmitted them to the Secretary of the Interior, with his approval of the plan, about January 30, 1923. With the papers submitted to the Commissioner and the Secretary, there was a report by Ward on the subject containing an argument in favor of the plan, which report bore at the bottom the approval, dated January 29, 1923, of Victor M. Locke, Superintendent for the Five Civilized Tribes.

Notwithstanding the obvious state of mental incapacity of the Indian, his guardianship in Oklahoma, his kidnapping and marriage concerning which the Indian Tribal Attorney recited in his communication to the Interior Department that Mrs. Lowe was an adventuress and had had a bad reputation and had married Barnett from mercenary motives, and the fact that the thumb-print document which was submitted as the so-called request of the Indian for the release of his funds consisted of several typewritten pages, written in the language of the lawyer and such as to require close consideration and examination by a person of full intelligence to properly understand it and could not have been understood or comprehended by Jackson Barnett, nevertheless the Department approved the plan and released Liberty bonds in the amount of $1,100,000 of the Indian's property. $550,000 of that amount was received immediately by Mrs. Lowe-Barnett, and $550,000 was deposited with the Equitable Trust Company of New York for the benefit of the American Baptist Home Mission Society to be retained as an endowment fund for the benefit of Bacone College, an Indian School located near Muskogee, Oklahoma, and for Murrow Indian Orphans' Home at Bacone. $20,000 of the income derived from the last mentioned endowment fund was to be paid to the Superintendent of Indian Tribes at Muskogee, Oklahoma, for the use and benefit of Jackson Barnett and after restrictions were removed, directly to Barnett.

Of the $550,000 in bonds delivered to Mrs. Barnett, $200,000 were deposited with the Riggs National Bank in trust to carry out the trust agreement between Mrs. Barnett and the bank, and $137,500 of the bonds were delivered by Mrs. Barnett to McGugin pursuant to their contract. McGugin delivered to M. S. Mott, of Tulsa, Oklahoma, who had assisted him in the formation of the plan, $15,000 in bonds, to his law partner Keith $35,000, deposited $20,000 with the Riggs National Bank, and retained for himself $67,500.

Much of the foregoing was succinctly stated by Mr. Justice Van Devanter in the Equitable Trust case, U. S. v. Equitable Trust Co. of New York, 283 U.S. 738, pages 740, 741, 51 S.Ct. 639, 640, 75 L.Ed. 1379, as follows:

"News of Barnett's wealth became widespread and, thereafter, as was found by the District Court, he was kidnapped by an adventuress who took him to two States other than that of his residence and had him go through a marriage ceremony with her in both; was harassed and annoyed by her attorneys and their allies; and on December 15, 1922, was induced by them to put his thumb mark upon an instrument, not understood by him, requesting the Secretary of the Interior to distribute the greater part of the trust fund in the latter's custody by giving $550,000 in Liberty bonds to the wife, and a like sum in such bonds to the American Baptist Home Mission Society, on condition that it pay for his use $20,000 a year during the remainder of his life. Barnett was then about 73 years of age, and the designated annuity was less than the yearly interest on the bonds to be given to that society.

"On February 1, 1923, the Secretary of the Interior approved that instrument, and soon after approving it he distributed the $1,100,000 in Liberty bonds as requested."

Likewise, the Supreme Court through Mr. Justice Van Devanter in the case of Mott v. United States, 283 U.S. 747, 51 S.Ct. 642, 75 L.Ed. 1385, has settled the right of the government to sue in behalf of an Indian ward for the recovery of his trust property wrongfully diverted. Mott was forced to give up the money paid him by McGugin. The Supreme Court said:

"Both McGugin and Mott at the time had full knowledge that the wife received the bonds as a gift out of Barnett's trust fund, that that fund represented royalties from the oil and gas lease of his restricted land, and that by reason of mental infirmity he was without capacity to initiate or make a gift or disposal of the bonds. * * *

"We are of opinion that the facts thus shown are such as to entitle the United States to the equitable relief which it seeks. * * *

"Barnett, according to the complaint, was mentally incompetent to a degree which made him wholly incapable of understanding, intending, or making such a request. Therefore the instrument, although bearing his thumb mark, was not his act, and could not bind him. With it eliminated, the gift in question stood as if made by the Secretary merely on his own volition. This was beyond his authority." 283 U.S. pages 750, 752, 51 S.Ct. pages 644, 645, 75 L.Ed. 1385.

Aside from the contention that Barnett was competent to make the gift, a contention utterly useless in the light of the fact he was not only mentally incompetent, but a restricted Indian, the defenses advanced here are new to the Barnett-McGugin controversies.

Defendants contend (1) that the action is barred by limitations; (2) that the matters are res adjudicata; and (3) that the action has abated by Barnett's death.

(1) *Limitations.* The original bill of complaint in this case was filed on April 10, 1928, and service obtained the day following. Defendants' motion to dismiss the bill was sustained (by Judge Pollock) on July 3, 1928, an application was made by the United States for leave to file an amended complaint. Hearing was had upon notice, leave was given (by Judge McDermott), and an amended bill of complaint was filed September 28, 1928. The second amended bill of complaint, under which the case was tried, was filed by leave of court on May 5, 1930. C. M. McGugin, a party defendant in the original complaint, was omitted from the later ones, and Nell Bird McGugin was added as a defendant but was not served with summons.

Defendants contend that under Section 2 of the Harreld-Hastings Act, a two-year provision in the statute of limitations of Oklahoma should be applied in this case as a bar to the cause stated in the second amended complaint; that a different cause of action was alleged in the second amended complaint from that in the original complaint; and that limitations had run before the tendering for leave to file of the second amended bill. The defendants assert the period expired on April 12, 1928.

The Harreld-Hastings Act, 44 Stat. 239, approved April 12, 1926, provides: "The statutes of limitations of the State of Oklahoma are hereby made and declared to be applicable to and shall have full force and effect against all restricted Indians of the Five Civilized Tribes, and against the heirs or grantees of any such Indians, and against all rights and causes of action heretofore accrued or hereafter accruing to any such Indians or their heirs or grantees, to the same extent and effect and in the same manner as in the case of any other citizen of the State of Oklahoma, and may be pleaded in bar of any action brought by

or on behalf of any such Indian, his or her heirs or grantees, either in his own behalf or by the Government of the United States, or by any other party for his or her benefit, to the same extent as though such action were brought by or on behalf of any other citizen of said State: Provided, That no cause of action which heretofore shall have accrued to any such Indian shall be barred prior to the expiration of a period of two years from and after the approval of this Act, even though the full statutory period of limitation shall already have run or shall expire during said two years' period, and any such restricted Indian, if competent to sue, or his guardian, or the United States in his behalf, may sue upon any such cause of action during such two years' period free from any bar of the statutes of limitations."

Section 3 of this Act lends some aid to its interpretation and application. It reads: "Any one or more of the parties to a suit in the United States courts in the State of Oklahoma or in the State courts of Oklahoma to which a restricted member of the Five Civilized Tribes in Oklahoma, or the restricted heirs or grantees of such Indian are parties, as plaintiff, defendant, or intervenor, and claiming or entitled to claim title to or an interest in lands allotted to a citizen of the Five Civilized Tribes or the proceeds, issues, rents, and profits derived from the same, may serve written notice of the pendency of such suit upon the Superintendent for the Five Civilized Tribes, and the United States may appear in said cause within twenty days thereafter, or within such extended time as the trial court in its discretion may permit, and after such appearance or the expiration of said twenty days or any extension thereof, the proceedings and judgment in said cause shall bind the United States and the parties thereto to the same extent as though no Indian land or question were involved. * * *"

■ Both sections relate to litigation of the same or analogous kinds. Both sections relate to litigation in which restricted Indians of the Five Civilized Tribes, or their heirs or grantees, may be party or parties or represented by the government of the United States. Section 3 expressly refers to a suit "in the United States courts in the State of Oklahoma or in the State courts of Oklahoma." It may be inferred that the same courts are meant, though not expressly mentioned in Section 2. Section

2 applies the Oklahoma limitations to the suits mentioned "to the same extent and effect and in the same manner as in the case of any other citizen of the State of Oklahoma," and further, "to the same extent as though such action were brought by or on behalf of any other citizen of said State." There is nothing in the Harreld-Hastings Act or the Oklahoma Statutes of limitation that makes those statutes operative in any trial court outside of Oklahoma and the result is such statutes are not to be applied in any trial court, state or federal, sitting outside the boundaries of Oklahoma. The federal adoption of the Oklahoma limitations is for the cases mentioned in section 2 which have been or will be brought in an Oklahoma court or a court sitting in Oklahoma.

■ Aside from consideration of the Harreld-Hastings Act, no statute of limitations applies to a suit of this kind brought by the United States, in the exercise of its governmental powers as guardian for a dependent Indian. United States v. Minnesota, 270 U.S. 181, 196, 46 S.Ct. 298, 70 L.Ed. 539; United States v. Board of Com'rs of Comanche County, D. C., 6 F.Supp. 401, 403.

*Res Judicata.* Defendants next contend that the issues here presented are res judicata. They plead the fact of the dismissal of the original complaint on the ground it did not state a cause of action, that no appeal was taken, that the second amended complaint alleges no facts additional to those contained in the original complaint, and that the issues presented by the second amended complaint are res judicata and plaintiff is estopped by said order of dismissal.

■ The contention is not good. Prior to the expiration of time within which an appeal might have been taken from the order of dismissal, the court granted leave to file an amended complaint. If the amended complaints state a cause of action and were sufficient in respects wherein the original complaint was insufficient and defective, there is no identity of issues and the matters now pleaded are not res judicata.

*Abatement.* A further defense is that on May 29, 1934, Jackson Barnett died intestate and without issue and that by reason thereof "this action abated and the plaintiff herein has no authority or legal capacity to maintain this suit."

This suit was brought by the United States as sole plaintiff for the use and benefit of Barnett in the exercise of its power and duty of guardianship over restricted Indians. The United States by this suit exerted merely its authority as a government to aid and protect the restricted Indian Jackson Barnett from dominating imposition and from spoliation. The suit was not only for the benefit of Barnett, but it was for the protection of every dependent Indian under the guardianship of the United States in the sense that a suit to guard the rights of one Indian, by its deterrent effect, may serve to protect the rights of every Indian.

In determining the right and duty of the United States in the matter, the controlling consideration is that the wrong was committed during the period of restriction upon Jackson Barnett. United States v. Moore, 8 Cir., 284 F. 86, 89. The transactions were all during the period of his restriction and the only efficient and effective protection was to be found in the power and authority of the United States as a government and guardian and for it to prosecute the case to the end. Since it is the interests and the governmental rights of the United States that are involved, the death of Barnett had no controlling effect on this lawsuit.

Barnett's consent was not required either to the institution or maintenance of this suit. He could not have consented because he was not mentally competent to consent. The guardianship and protection afforded dependent Indians would be gravely menaced if the government could not prosecute as a government, suits in aid of such protection.

There is the additional contention that defendants are entitled to be paid for their services to Mrs. Barnett and just compensation therefor on a quantum meruit basis should be allowed as a set off against the government's claims. There can be no denial of the fact that McGugin and his partner did render services and incurred much expense. But theirs were acts and services largely of their own volition, without authority or direction from the incompetent Barnett, and they were not rightfully paid from Barnett's funds. The money paid McGugin and which he seeks to hold was "tainted money" and was so recognized by the Kansas Supreme Court in the case of Mason v. McGugin, 118 Kan. 663, 667, 236 P. 845.

More might be said, but it is clear, in my opinion, that none of the defenses advanced is good, and the government is entitled to the recovery prayed for in the second amended complaint.

Findings of fact and conclusions of law, also a decree, already have been filed.