51 So.2d 429 (1950)
UNIVERSAL CONST. CO. et al.
v.
GORE et al.
Supreme Court of Florida, en Banc.
December 8, 1950.
Rehearing Denied April 7, 1951.
*430 Ross & Williams, T.O. Berryhill, George W. Tedder, Jr., and George W. Leaird, all of Fort Lauderdale, for appellants.
McCune, Hiaasen & Kelley, Fort Lauderdale, for appellees.
Blackwell, Walker & Gray, Miami, for purported cross-appellee.
TERRELL, Justice.
This case had its genesis in Schmeller v. City of Fort Lauderdale, Fla., 38 So.2d 36, wherein we affirmed a decree of the Circuit Court validating a bond issue to enable the City of Fort Lauderdale (1) to acquire certain ocean front property from the United States, better known as Coast Guard Base No. 6. (2) Construct a municipal yacht basin with other recreational facilities on said property. (3) Authorize the city to lease the facilities so constructed for a period of 20 years. Contracts were promptly made by the city looking to the purchase of said property and construction of the yacht basin. Contract for the construction of the latter project was made with appellant, Universal Construction Company.
January 29, 1949, the proceeds of the bonds became available to the city and so much thereof as necessary was used to purchase the Coast Guard Base. Construction was commenced on the yacht basin and other facilities February 2, 1949 and was continued to December 10, 1949, when it was suspended for four months. March 7, 1949 the city and the contractor entered into a second agreement which provided that during the period of construction the contractor could devote such portions of the project as it had completed to commercial use, retaining 94 per cent of the gross revenues therefrom and pay the remaining six per cent to the city.
The contract provided that the project be completed within two years from September 22, 1948 for a consideration of $1,710,500.00. It also required the contractor to construct "additional buildings of the value of $212,500.00-No charge." September 6, 1949, at the request of the contractor the city adopted a resolution which declared that the contractor had installed extras on the project that would be accepted in place of "additional buildings," and thereby released the contractor from constructing "additional buildings of the value of $212,500.00-No charge." *431 In the fall of 1949, the contractor and its assignee, Bahia Mar Corporation notified the public that the project was completed and ready for operation as of October 27, 1949.
December 1, 1949, Behia Mar Corporation and the contractor took possession of the project and devoted it to commercial use. They did not pay the rental provided in the 20 year lease which required that it commence on the date the lessee took charge at the rate of $160,000.00 per year. The tourist season for 1949-50 was alleged to be a very profitable one but the contractor and its assignee paid the city only six per cent of the gross revenues collected in rentals and retained 94 per cent for themselves. January 20, 1950 certain of the bond holders, utility and general tax payers, made demand on the city to require the lessee to pay rent as provided by the 20 year lease and to require the contractor to fulfil its obligation to construct "additional buildings of the value of $212,500.00-No charge" as required by the contract. The city declined to do so.
March 7, 1950, the plaintiffs brought this suit against the contractor and the lessee, the city having declined to bring it or be joined as a party plaintiff was named as a party defendant. The purpose of the suit was, (1) to invalidate the agreement of March 7, 1949, on the ground that it impaired the bond contract. (2) Invalidate the release given by the city to the contractor by the resolution of September 6, 1949, and require the contractor to construct "additional buildings of the value of $212,500.00-No charge," and (3) Require the lessee to pay rent as of December 1, 1949, at the rate of $160,000.00 per annum, the minimum rent fixed in the twenty-year lease, or to require the lessee and its affiliates to pay the city "the entire gross revenues derived from the operation of the recreational facilities."
On final hearing the chancellor entered a decree in which he found (1) that the contractor had failed to construct "additional buildings of the value of $212,500.00-No charge." (2) Found that the contractor had not complied with this provision except as to two buildings of the value of $15,620.00. (3) Because of this delict on the part of the contractor a money judgment against it in the sum of $196,800.00 was entered in favor of the city in lieu of the $212,500.00 additional buildings. (4) Adjudicated the twenty-year lease to be effective as of December 1, 1949 and required by the contract to be paid the city from that date. (5) Counterclaim of the contractor against the city in the sum of $341,831.00 was rejected. We are confronted with an appeal and a cross-appeal from the final decree.
At the outset cross appellants contend that none of the questions urged by appellants can be reviewed here because the appeal and the assignments of error are joint, not several, consequently they are offensive to the rule that a joint appeal and joint assignment of error must be predicated on a ruling against all parties to the cause and must be erroneous as to all, otherwise it will be held erroneous as to none.
The defendants against whom the judgment was secured, were Universal Construction Company, Bahia Mar Corporation and the City of Fort Lauderdale. They took a joint appeal based on joint assignments of error and filed a joint brief in this court. They urge six questions but in none of them are all defendants jointly aggrieved. In the first question the issues were decided in favor of the city, they were adverse to Universal Construction Company but did affect Bahia Mar Corporation. A like situation applies to the second, third and fifth questions. The fourth question was adverse to Bahia Mar Corporation, was in favor of the City and does not affect Universal Construction Company. The judgment as to the sixth question affected no one but the bondholders, none of the defendants were affected by it unless the city may have been. It will thus be seen that while the city resisted the plaintiff's contentions in the court below it was the recipient of all the fruits of the decree.
This court is committed to the doctrine that an appeal and a joint assignment of error must be good as to all who join in it or it will not be available as to any, and if it is not good as to one, it will be overruled *432 or disregarded as to all. McMillan v. Warren, 59 Fla. 578, 52 So. 825; McKinnon v. Lewis, 60 Fla. 125, 53 So. 940; Kloss v. State, 95 Fla. 433, 116 So. 39; Palm Beach Estates v. Croker, 106 Fla. 617, 143 So. 792; Vaughn-Griffin Packing Co. v. Fisher, 141 Fla. 428, 193 So. 553; 3 American jurisprudence, page 290, Section 699, 4 C.J.S., Appeal and Error, § 1248, page 1747; McMullen v. Fort Pierce Financing & Construction Company, 108 Fla. 492, 146 So. 567, are also pertinent.
On the basis of the rule approved in these decisions we would be warranted in affirming the decree appealed from, but we are convinced that the chancellor should be affirmed on the merits and that our reasons for such affirmance should be given. Numerous questions are presented but we have crystalized and will explore them under the following heads: (1) The chancellor's interpretation of that part of the contract requiring the contractor to construct "additional buildings of the value of $212,500.00-No charge." (2) Decreeing the twenty-year lease to commence December 1, 1949 and to bear the lease rental from that date. (3) Decreeing that plaintiff's solicitors be awarded solicitors fees from the rents accruing from the lease.
That part of the contract requiring the contractor to construct "additional buildings of the value of $212,500.00-No charge," was a part of the Recreation Revenue Bond contract validated in Schmeller v. City of Fort Lauderdale, Fla., 38 So.2d 36. It thereby became a part of the construction contract and could not be impaired or modified by the parties thereto except in the manner first executed, that is to say, by advertisment and competitive bidding. The same interpretation applies to the resolutions of the city adopted September 6, 1949, and April 17, 1950, relating to the contract. The contract and the evidence abundantly show that the requirement to construct "additional buildings of the value of $212,500.00-No charge" was never performed, except as to $15,620.00 and that the two resolutions and other proceedings amounted to a repudiation of the construction contract. It necessarily follows that the only decree the chancellor could have entered on this phase of the case was the one entered for $196,880.00.
In this holding we do not overlook the contention of appellants that the construction contract was not intended to impose on them the obligation to construct "additional buildings of the value of $212,500.00-No charge", that said obligation was based on an oral agreement which was gratuitous and wholly without legal effect, that the contractor had four years from the commencement of the lease to comply with said obligation, which was not to construct "additional buildings" but to do extra work on the project, that said obligation had been completely performed and so decided by the city commission whose decision was final except on showing of fraud as revealed by the resolutions of September 6, 1949 and April 17, 1950.
In the court's interlocutory decree of April 28, 1950, the final decree of June 26, 1950 and the supplemental decree of August 22, 1950, all these contentions were considered and answered. These decrees hold in terms that the contract required "additional buildings to the value of $212,500.00-No charge" to be constructed within the life of the contract. In the final decree the chancellor modified his orginal finding by allowing the ten per cent retainage to be paid the contractor notwithstanding non-performance of its obligation to furnish "additional buildings," but this in no sense relieved from or modified the essential requirement of the contract which is the primary point of departure between the parties to this cause. When the contract, the contractor's proposal and the validating decree in Schmeller v. City of Fort Lauderdale are read as a whole, we do not see how the chancellor could have reached any other conclusion.
We next consider appellants' assault on that part of the decree fixing December 1, 1949 as the date for the beginning of the twenty-year lease. It is contended that the correct date for commencement of said lease should have been April 1, 1951, instead of December 1, 1949. In the final decree the chancellor found that the contract *433 required the lease to begin on the date the improvements were completed. He further found that the improvements under the contract were completed before December 1, 1949. The evidence fully supports the finding of the chancellor on both points. The lease in terms requires the leased premises to be turned over to the lessee on the date construction is completed, so we do not think it necessary to labor this question further.
The question of solicitors fees is covered by appellants' sixth assignment of error and appellees third and fourth cross assignments of error. The chancellor allowed plaintiffs' solicitor a fee of $10,000.00 payable by the city from the first annual lease rentals. Appellants contend that no fee whatever should have been allowed while appellees contend that the amount allowed was entirely inadequate for the services performed. Experienced counsel testified that a minimum fee of $25,000.00 or a maximum fee of $40,000.00 would be reasonable for the services performed. The contract provided for solicitors fees in the event litigation should be required. They were prayed for in the bill of complaint.
The suit was brought by holders of municipal recreational bonds who were also general and utility taxpayers in the city. It was brought as a class suit to preserve and protect trust funds. It resulted in (1) a judgment in favor of the city for $196,880.00 to cover the obligation of the contract to furnish "additional buildings of the value of $212,500.00-No charge." The city and the contractor contended that the contract did not impose the obligation and if so, it had been fully performed. (2) A decree holding that the twenty-year lease commenced December 1, 1949 and bore rental at $160,000.00 per annum. The city and the lessee contended that the rent on the lease did not commence till January 1, 1951. The rent produced for the city aggregated $173,333.33. (3) Defeated a counterclaim against the city in favor of the contractor for $341,831.00, the details of which it is not necessary to recite. It is therefore contended that the total results of the litigation in favor of the city were $712,144.33.
This court is committed to the doctrine that a trust estate should bear the expense of its administration and that where one of the parties interested brings a suit or takes other steps to protect or restore it, he is entitled to reimbursement out of the fund preserved or from those who accept the benefits of it. Tenney v. City of Miami Beach, 152 Fla. 126, 11 So.2d 188; United States v. Equitable Trust Company, 283 U.S. 738, 51 S.Ct. 639, 75 L.Ed. 1379; Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184. In the light of these cases the chancellor was correct in the allowance of fees to complainants' solicitors from the rentals recovered. A controversy over attorneys fees is always a delicate question. In view of the work done, the skill employed and the results accomplished, a larger fee would not be out of line. At the same time cases arise in which an adequate fee cannot be allowed. Solicitors fees should not be the outstanding factor in the case and with other costs they should not take the lions share of the funds recovered. The bar will justly suffer in public esteem when the impression goes out that it is the main beneficiary from litigation. There may be factors in this case not in our possession which support the chancellor's allowance. He is more familiar with the scale of fees in that locality and the elements that control them than we are. We therefore affirm his decree on this point.
In their fifth cross assignment of error appellees contend that the chancellor committed error in ordering the ten per cent retainage (approximately $160,000.00) which had accumulated on the construction contract, paid over to the contractor or his assignee before the contract was fully performed, lack of performance having reference primarily to the obligation to provide additional buildings in the value of $212,500.00.
In the final decree the chancellor found that this case presents the most unusual instance of a "municipal contractor-lessee who has spent thousands of dollars in construction, upon city property, without any written contract, without competitive bids, without any plans and specifications approved by *434 the city commission, and based upon oral understandings between the contractor and some city officials, to the effect that this construction should be accepted in lieu of a contractual obligation to provide "additional buildings of the value of $212,500.00-No charge."
The chancellor further found that the record disclosed no intentional fraud or dishonesty on the part of the contractor or the city officials. That the city and the contractor would set at naught the contract they entered into and attempt an improvement the magnitude of that involved here, without a written contract, without plans or specifications and without competitive bids or without anything more than a verbal understanding, is indeed astonishing and unheard of. The verbal contract was contrary to the statute and the provision of the city charter.
In the conduct of municipal business, officials to whom it is intrusted are limited by the terms of the law defining their powers and duties. They cannot deal as private individuals with municipal contracts. In this case a contract involving more than a million dollars was bandied about and "handled with little regard for the fact that public funds and public property were involved which only could be handled as authorized by law." The city and the contractor excuse their conduct on the ground that the city was in need of the facility (yacht basin) and other improvements, that the city was the gainer and much in need of the facilities for the entertainment of winter visitors. The fact that it was contrary to law and sound principles of municipal conduct apparently did not enter the picture.
The conduct of public business in this way is infected with so many vices that we refrain from an attempt to list them. In the first place a court of equity will not tolerate slipshod methods in the conduct of municipal business, it is limited by legal metes and bounds and to look with approval on what took place in this case would cast law and order to the discard and remove every restraint to safeguard city funds and protect the public. In the second place when municipal affairs are handled in the manner shown here, fraud and corruption inevitably follow. The law not only defines the course of the chancellor, it just as clearly defines the course for city officials. They take an oath to follow it and subject themselves to removal if they fail to do so. Nothing tends more to shake the confidence of the public in local, state or national government than the delicts of public officials. The mere fact that another course is desirable is no excuse. It is a question of restoring public confidence, now perhaps at the lowest point in the history of the country. Approval of the conduct complained of here would be tantamount to a declaration to all municipalities that they are bound by no law, contract or other restraint.
Democratic government must necessarily rest on public confidence. It is a difficult matter for the legislature to cast a statute in such terms that it cannot be distorted or twisted to reach an evil purpose but the public expects integrity in those it elects or delegates to transact its business and when they become so morally obtuse as to lose sight of the right and launch out on a course that must inevitably lead to wrong and corrupt dealing, then it is quite evident why the public loses faith in the manner in which its government is being conducted. No official who has the sense of public responsibility that is expected of him will permit this to take place.
On this and other assignments and cross assignments we can reconcile the chancellor's finding on but one theory and that is the contract had been so manipulated by the city and the contractor that a condition had arisen that made it impossible to strike an accounting and balance the books. Since he found that there was no showing of fraud he doubtless concluded that the best course out of an ugly situation was to restore the city as near whole as possible and leave the contractor where he found him. He had the discretion to do this and finding no error we affirm his decree.
Affirmed.
ADAMS, C.J., and CHAPMAN, THOMAS, HOBSON and ROBERTS, JJ., concur.