John P. McNAMARA, Plaintiff-Appellee,

v.

J. C. MOODY, etc., Defendant-Appellant.

No. 77–2466.

United States Court of Appeals,
Fifth Circuit.

Nov. 15, 1979.

Anthony J. Golden, Benedict Paul Kuehne, Asst. Attys. Gen., West Palm Beach, Fla., for defendant-appellant.

Hubert R. Lindsey, West Palm Beach, Fla., for plaintiff-appellee.

Before GODBOLD, Circuit Judge, SKELTON *, Senior Judge, and RUBIN, Circuit Judge.

GODBOLD, Circuit Judge:

Appellee is a prisoner in the Glades Correctional Institution at Belle Glade, Florida. He brought suit against two officials of that institution alleging that they had wrongfully prevented him from mailing certain letters. The district court found that appellant Moody, assistant superintendent of Glades, had violated McNamara's constitutional rights by refusing to mail a letter to his girlfriend.[1] This two-

---

* Senior Judge Byron G. Skelton of the United States Court of Claims, sitting by designation.

1. The letter was addressed to "Mrs. John P. McNamara," but both parties refer to the intended recipient as appellee's "girlfriend."

page letter dealt in large part with McNamara's discontent with the prison mail censorship system, but it also charged that the mail censoring officer, while reading mail, engaged in masturbation and "had sex" with a cat. Moody found the part of the letter referring to the mail censoring officer to be "in poor taste" and returned it to McNamara with a warning that any future attempts to send similar letters would lead to disciplinary action.[2] The district court granted the prisoner injunctive relief, nominal damages against appellant individually, and attorney's fees.

The law in this area has been well settled since the Supreme Court's decision in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). There the Court recognized that letters between inmates and individuals on the outside involve the First Amendment rights of the outside correspondents as well as those of the prisoners.[3] These rights are equally implicated regardless of whether the outsider is the sender or recipient. 416 U.S. at 408–09, 94 S.Ct. at 1808, 1809, 40 L.Ed.2d at 237. The Court therefore set forth a rule that strictly limits prison censorship of such correspondence:

> [C]ensorship of prisoner mail is justified if the following criteria are met. First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad.

416 U.S. at 413–14, 94 S.Ct. at 1811, 40 L.Ed.2d at 240.

---

2. The portion of McNamara's letter found to be offensive reads as follows:

> I wish I could write w/o some perverted dung-hole reading my words, but such is not the case. It is really a shame that there are those who have such a blah ! life that they must masturbate themselves while they read other people's mail. I don't think the guy is married; however, one of the freeman told me the other day that he has a cat and that he is suspected of having relations of some sort with his cat. If the shoe fits him, watch him blush the next time we see him. I'll point him out to you and you can laugh at him. "Look, honey. There goes that pervert who has sex with a cat and masturbates while reading other people's mail." This is what I think of him. These are my thoughts, and I am entitled to them.

The full text of Moody's note to McNamara was as follows:

> I find your letter in poor taste and absolutely unacceptable for mailing from this institution.

The other letter involved in the case was one written to a member of Congress. It was rejected because it was not written on prison stationery. The district court found no constitutional infirmity in the prison stationery rule, and appellee does not press the point now.

> In the future you will refrain from derrogatory [sic] remarks about the mail room officers and their business. They have a job to do and I intend that they do it. There is not any intent on their part to harrass you or anyone else. I assure you that my patience is running very short with your juvenile antics. The next time you write a letter such as the one attached, you may be sure that you will meet with the disciplinary team.

3. The Court based the *Martinez* holding squarely on the First Amendment rights of the outside correspondents, thus avoiding the somewhat more difficult question of the scope of prisoners' First Amendment rights. The exigencies of prison administration justify some more stringent restrictions on prisoners' speech and association than would be permissible on the outside. *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). The only aspect of *Jones* concerning communications between prisoners and those on the outside was its allowance of a prison rule against bulk mailings of literature for redistribution in the prison. In approving such a rule the Court stressed that it had no effect on communication between outside individuals and individual inmates. 433 U.S. at 128, 97 S.Ct. at 2539, 53 L.Ed.2d at 640.

■ Appellant makes three attempts at identifying the required "substantial governmental interest." The first is his contention that to allow letters like this would result in "a total breakdown in prison security and discipline." This is similar to the contentions made by prison officials in *Martinez* and found unpersuasive by the Supreme Court. There it was claimed that mail containing "disrespectful comments" or "derogatory remarks", or statements that "magnify grievances" or "unduly complain" could be censored "as a precaution against flash riots and in the furtherance of inmate rehabilitation." 416 U.S. at 415–16, 94 S.Ct. at 1812, 40 L.Ed.2d at 241. The Court found this an inadequate justification, since the officials did not give any indication of what causal relationships there could be between such mail and these results. No one wants to be the target of insulting remarks like those in McNamara's letter. But coarse and offensive remarks are not inherently breaches of discipline and security, nor is there any showing that they will necessarily lead to the breaking down of security or discipline. As we have recognized, "*Martinez* . . . emphatically states that mere complaints and disrespectful comments cannot be grounds for refusing to send or deliver a letter." *Guajardo v. Estelle,* 580 F.2d 748, 757 (CA5, 1978). Censorship for violation of prison disciplinary rules is properly limited to communications that relate to more concrete violations such as "escape plans, plans for disruption of the prison system or work routine, or plans for the importation of contraband." *Id.;* [4] *see Martinez,* 416 U.S. at 413, 94 S.Ct. at 1811, 40 L.Ed.2d at 240. Appellant argues that if insults such as this were made orally to prison guards, face to face, they would be punishable as breaches of discipline. This may be so; we need not decide it. These remarks were in writing and were directed to the inmate's girlfriend, not the prison staff.

■ Appellant contends that the letter "could also be considered obscene." Vulgar it is; obscene it is not. The Supreme Court, faced with a similar situation in *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971),[5] reminded that:

Whatever else may be necessary to give rise to the States' broader power to prohibit obscene expression, such expression must be, in some significant way, erotic. . . . It cannot plausibly be maintained that this vulgar allusion to the Selective Service System would conjure up such psychic stimulation in anyone . . .

403 U.S. at 20, 91 S.Ct. at 1785, 29 L.Ed.2d at 291. Judged by this standard, the inmate's letter in this case is not obscene. We have held that there may be some prison censorship of sexually explicit materials that fall short of obscenity. *Guajardo,* 580 F.2d at 757. But under *Martinez* there must still be some connection to a governmental interest. In *Guajardo* that interest was the prohibition of materials that might exacerbate a prison problem of sexual attacks. *Id.* at 762. No such interest is implicated by the mailing of non-erotic vulgarities from a prisoner to a person on the outside.

Finally, appellant argues that the letter was libelous. Even if it is libelous, *Martinez* indicates that letters may not be suppressed simply because they are "defamatory". 416 U.S. at 415–16, 94 S.Ct. at 1812, 40 L.Ed.2d at 224. Here again there must be some relation to a substantial governmental interest, and the appellant has advanced no such interest here. If the warden's purpose is to prevent strongly worded and exaggerated criticism of prison officials from reaching the public, this is precisely the sort of purpose ruled impermissible by *Martinez.*

---

4. In *Guajardo* we rejected the contention that a rule providing for censorship of letters concerning plans for the violation of prison rules was overly vague. In so doing we relied upon our conclusion that, in light of *Martinez,* the regulation could not have been meant to apply to mere disrespect.

5. In that case the appellant had been prosecuted for publicly wearing a jacket with the words "Fuck the Draft" written on it. 403 U.S. at 16, 91 S.Ct. at 1780, 29 L.Ed.2d at 289.

The district court awarded nominal damages of one dollar against appellant individually. All the court said in support of the award is that despite lack of actual damages, "nominal damages may be presumed when constitutionally protected rights are violated," *citing Sexton v. Gibbs,* 327 F.Supp. 134, 142 (N.D.Tex.1970), *aff'd* 446 F.2d 904 (CA5, 1971), *cert. denied,* 404 U.S. 1062, 92 S.Ct. 733, 30 L.Ed.2d 751 (1972). Appellant contends that he is immune from an award of damages because of his good faith. Although the district court did not address this issue in its order, we find no error with the award of damages.

■ The Supreme Court has recognized that while 42 U.S.C. § 1983 exposes state and local officials to individual liability for damages under some circumstances, Congress did not intend by enacting that section to strip such officials of immunity afforded them at common law. *Procunier v. Navarette,* 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24, 30 (1978). Some officials, such as judges, prosecutors, and legislators, are absolutely immune. *Id.* Most other officials have a qualified immunity for acts performed with a good faith belief, based on reasonable grounds, of their legality. *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90, 103 (1974). This immunity varies according to the scope of the official's discretion and responsibility.[6] *Id. Procunier v. Navarette, supra,* establishes that it is this qualified immunity, as developed in *Scheuer v. Rhodes* and *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), that applies to state prison officials. 434 U.S. at 561–62, 98 S.Ct. at 859–860, 55 L.Ed.2d at 30–31.

We recently discussed the application of this test to prison officials:

*Wood v. Strickland* clarified the *Scheuer* defense by establishing a dual test for measuring the existence of qualified immunity which requires both an objective and a subjective measurement of official conduct. Under the objective test of *Wood,* an official, even if he is acting in the sincere subjective belief that he is doing right, loses his cloak of qualified immunity if his actions contravene "settled, indisputable law." Thus, an official is liable under section 1983 "if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights" of the person affected. The fulcrum of this objective first half of *Wood* is the existence, at the time of the official's action, of clearly established judicial decisions that make his action unconstitutional. An official is not "charged with predicting the future course of constitutional law." *Navarette* brought the objective part of the *Wood* formulation forward without alteration

. . . . .

*Bogard v. Cook,* 586 F.2d 399, 411 (CA5, 1978) (citations omitted).[7]

■ Under these principles, the evidence before the trial judge justified an award of damages against appellant. He made the decision not to allow the letter to be mailed and signed the note to the prisoner telling him that it was "in poor taste." For the reasons discussed above, suppression of the letter is clearly proscribed by the First Amendment. While the law on this subject was uncertain before *Martinez,*[8] that opin-

---

**6.** Thus the district court was justified in imposing liability on appellant Moody, who made the decision to suppress the letter, while not imposing liability on defendant Fluharty, the mail censoring officer, who merely referred the matter to Moody.

**7.** *Bogard* then goes on to state that:

Under that second branch of the official immunity doctrine, an official forfeits his immunity, if whatever the objective state of the law at the time of his conduct, his subjective intent was to harm the plaintiff.

*Id.* This point does not concern us, since there is no showing here of appellant's subjective intent.

**8.** Before *Martinez* "the tension between the traditional policy of judicial restraint regarding prisoner complaints and the need to protect constitutional rights . . . led the federal courts to adopt a variety of widely inconsistent approaches to the problem [of prisoner mail]." *Martinez,* 416 U.S. at 406, 94 S.Ct. at 1808, 40 L.Ed.2d at 236. In *Procunier v. Navarette, supra,* the Court relied on this fact in holding that in the period 1971–1972 (before *Martinez* )

ion brought clarity to the area. McNamara's letter was written over a year and a half after *Martinez* was decided. Under *Bogard, Navarette,* and *Wood,* the award of nominal damages must be affirmed.[9]

Finally, the district court awarded costs and attorney's fees against appellant, both individually and in his official capacity. In an action brought under 42 U.S.C. § 1983, attorney's fees may be awarded to the prevailing party under the Attorneys' Fees Awards Act of 1976, P.L. 94–559, 90 Stat. 2641, 42 U.S.C. § 1988. We have held that the award provisions are applicable to all cases that were pending, as was this one, at the time of enactment. *Rainey v. Jackson State College,* 551 F.2d 672, 675 (CA5, 1977). Awards against an individual in his official capacity may be made; they are treated as awards against the state. *Hutto v. Finney,* 437 U.S. 678, 689, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522, 539–40 (1978). There is no Eleventh Amendment bar to such awards, and they need not be based on bad faith.

A more difficult question is whether it was also proper to award attorneys' fees against appellant in his individual capacity. At first glance an affirmative answer seems dictated by the statutory language. Appellee prevailed over appellant in his individual capacity as well as in his official capacity, by virtue of the award of nominal damages that we affirm. Such an award may be the basis of an attorney's fee award under § 1988. *See Perez v. University of Puerto Rico,* 600 F.2d 1 (CA1, 1979). However, the legislative history of the Act casts some doubt on this conclusion. The Senate Re-

port recommending passage of the Act stated:

> [D]efendants in these cases are often State or local bodies or State or local officials. In such cases it is intended that the attorneys' fees, like other items of costs, will be collected either directly from the official, in his official capacity [7] from funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named party).
>
> [7] Proof that an official had acted in bad faith could also render him liable for fees in his individual capacity, under the traditional bad faith standard recognized by the Supreme Court in *Alyeska,* . . .

S.Rept. 94–1011 at 5, 5 U.S.Code Cong. & Admin.News 1976, p. 5908, at 5913 (1976) (footnote omitted). This passage appears to evince a congressional purpose not to subject state and local officials to liability for attorney's fees unless they act in bad faith according to the American common law standard mentioned in *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). However, the Supreme Court in *Wood* redefined bad faith to include both subjective and objective indicia. As Justice Powell noted, the majority opinion in *Wood* "explicitly equated" disregard of settled law with actual malice. 420 U.S. at 328, 95 S.Ct. at 1004, 43 L.Ed.2d at 229. The district court's finding that Moody was guilty of objective bad faith therefore, under *Wood,* satisfies the congressional requirement that an official be guilty of bad faith if attorney's fees are to be awarded against him in his individual capacity.

---

there were no "clearly established" rights with respect to prisoner correspondence and that therefore officials could not be liable under *Wood* for infringing such rights. 434 U.S. at 562–65, 98 S.Ct. at 860–861, 55 L.Ed.2d at 31–33.

**9.** Our conclusion is not altered by the district court's statement in another part of its order that "[p]laintiff has made no showing that the withholding of plaintiff's letter was done willfully, with reckless disregard for plaintiff's rights." This observation was made with regard to an unrelated issue, the court's refusal

(not challenged here) to award punitive damages. Thus it was not made in conjunction with a consideration of the "objective" part of the *Wood v. Strickland* test. Even if we were to consider this a relevant finding of fact, we are not bound by it, since our review of this case (submitted on stipulations and documents without oral testimony) is not limited to the usual clearly erroneous standard. *Nash v. Estelle,* 597 F.2d 513, 518 (CA5, 1979) (en banc); *Caradelis v. Refineria Panama, S.A.,* 384 F.2d 589, 593 (CA5, 1967).

Moreover, even assuming that the *Alyeska* standard requires subjective bad faith,[10] to apply such a standard would lead to an anomalous result. Prevailing plaintiffs who are awarded only money damages against state officials (based on conduct found in bad faith under the objective part of the *Wood* test) would receive no attorney's fees under the Act. Were we to read the Senate Report as mandating such a result we would be creating a significant gap in § 1988's coverage without any basis in the statutory language.

The Supreme Court has suggested a reading of the Senate Report passage that gives it effect without creating such a broad exception to the coverage of § 1988. In *Hutto v. Finney, supra,* the Court, in discussing the passage, indicated that the *Alyeska* standard would be applied to officials "in injunctive suits." 437 U.S. at 699, 98 S.Ct. at 2578, 57 L.Ed.2d at 540. This interpretation, combined with the *Wood* test for immunity from damages, provides a reasonable accommodation of the conflicting interests involved. It also conforms with the natural reading of § 1988, that wherever an individual damage claim can be sustained an individual attorney's fee award may be made. Since we find that Moody's conduct is not immune from damages under *Wood,* we affirm the district court's attorney's fee award.

AFFIRMED.

SKELTON, Senior Judge, concurring in part and dissenting in part:

I respectfully dissent with respect to that portion of the majority's opinion which affirms the award of attorney's fees against the Appellant in his individual capacity in the absence of a finding that Appellant acted in bad faith. Such an award is, in my opinion, contrary to both Congressional intent and case law. I concur with respect to the remainder of the majority opinion.

Prior to the 1976 amendment to 42 U.S.C. § 1988 which authorized a court in its discretion to allow reasonable attorney's fees as a part of the prevailing party's costs, the Supreme Court set out the American rule and its exceptions for the award of attorney's fees in the case of *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). In this regard, the court stated:

"Against this background, this Court understandably declared in 1967 that with the exception of the small amounts allowed by § 1923 [28 U.S.C. § 1923], *the rule 'has long been that attorney's fees are not ordinarily recoverable . . . .' Fleischmann Distilling Corp.,* 386 U.S., at 717, 87 S.Ct. 1404, [1407] 18 L.Ed.2d 475. Other recent cases have also reaffirmed the general rule that, absent statute or enforceable contract, *litigants pay their own attorneys' fees.* See *F. D. Rich Co.,* 417 U.S., at 128–131, 94 S.Ct. 2157, [2164–2166] 40 L.Ed.2d 703; *Hall v. Cole,* 412 U.S. 1, 4, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973).

"To be sure, the fee statutes have been construed to allow, in limited circumstances, a reasonable attorneys' fee to the prevailing party in excess of the small sums permitted by § 1923. In *Trustees v. Greenough,* 105 U.S. 527, 26 L.Ed. 1157 (1882), the 1853 Act [Act of Feb. 26, 1853, 10 Stat. 161] was read as not interfering with the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or property itself or directly from the other parties enjoying the benefit. That rule has been consistently followed. *Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); *Harrison v. Perea,* 168 U.S. 311, 325–326, 18 S.Ct. 129, [134–135] 42 L.Ed. 478 (1897); *United States v. Equitable Trust Co.,* 283 U.S. 738, 51 S.Ct. 639, 75 L.Ed. 1379 (1931); *Sprague v. Ticonic National Bank,* 307

---

**10.** We find no authority indicating whether an *Alyeska* bad faith award may be made in the absence of subjective bad faith. Because we decide this case on other grounds, we need not reach this issue.

U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Hall v. Cole,* supra; cf. *Hobbs v. McLean,* 117 U.S. 567, 581–582, 6 S.Ct. 870, [876–877] 29 L.Ed. 940 (1886). See generally Dawson, Lawyers and Involuntary Clients: Attorney Fees From Funds, 87 Harv.L.Rev. 1597 (1974). *Also, a court may assess attorneys' fees* for the 'willful disobedience of a court order . . . as part of the fine to be levied on the defendant[,] *Toledo Scale Co. v. Computing Scale Co.,* 261 U.S. 399, 426–428, 43 S.Ct. 458, [465–466] 67 L.Ed. 719 (1923),' *Fleischmann Distilling Corp. v. Maier Brewing Co.,* supra, 386 U.S., at 718, 87 S.Ct. 1404, 18 L.Ed.2d 475; *or when the losing party has 'acted in bad faith,* vexatiously, wantonly, or for oppressive reasons . . .' *F. D. Rich Co.,* 417 U.S. at 129, 94 S.Ct. 2157, 40 L.Ed.2d 703 (citing *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962)); cf. *Universal Oil Products Co. v. Root Refining Co.,* 328 U.S. 575, 580, 66 S.Ct. 1176, [1179] 90 L.Ed. 1447 (1946). These exceptions are unquestionably assertions of inherent power in the courts to allow attorneys' fees in particular situations, unless forbidden by Congress, . . . ." (Emphasis supplied). 421 U.S. at 257–258, 95 S.Ct. at 1612, 1621, 1622, 44 L.Ed.2d at 153–154.

In addition to the statement of the rule and its exceptions, the court was careful to emphasize that it was the province of Congress and not the courts to determine when and if attorney's fees could be awarded. The Court stated as follows:

"Congress has not repudiated the judicially fashioned exceptions to the general rule against allowing substantial attorneys' fees; but neither has it retracted, repealed, or modified the limitations on taxable fees contained in the 1853 statute and its successors. Nor has it extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted. What Congress has done, however, while fully recognizing and accepting the general rule, is to make specific and explicit provisions for the allowance of attorneys' fees under selected statutes granting or protecting various federal rights. These statutory allowances are now available in a variety of circumstances, but they also differ considerably among themselves. Under the antitrust laws, for instance, allowance of attorneys' fees to a plaintiff awarded treble damages is mandatory. In patent litigation, in contrast, '[t]he court in *exceptional* cases *may* award reasonable attorney fees to the prevailing party.' 35 USC § 285 [35 USCS § 285] (emphasis added.) Under Title II of the Civil Rights Act of 1964, 42 USC § 2000a–3(b) [42 USCS § 2000a–3(b)], the prevailing party is entitled to attorneys' fees, at the discretion of the court, but we have held that Congress intended that the award should be made to the successful plaintiff absent exceptional circumstances. *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). See also *Northcross v. Board of Education of the Memphis City Schools,* 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973). Under this scheme of things, *it is apparent that the circumstances under which attorneys' fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine.*

.     .     .     .     .

"But the rule followed in our courts with respect to attorneys' fees has survived. *It is deeply rooted in our history and in congressional policy; and it is not for us to invade the legislature's province by redistributing litigation costs in the manner suggested* by respondents and followed by the Court of Appeals." (Emphasis supplied). 421 U.S. at 260–271, 95 S.Ct. at 1623, 1628, 44 L.Ed.2d at 154–156 and 161.

With the language of *Alyeska* in mind, I now consider the legislative intent of Con-

gress in enacting the 1976 amendment to 42 U.S.C. § 1988.[1]

On its face, the statute does not require any fact finding or other prerequisite prior to the award of attorney's fees; the matter is, of course, within the court's sound discretion. However, the legislative history behind the statute does present a different view. The Senate Report stated:

> "[D]efendants in these cases are often State or local bodies or State or local officials. In such cases it is intended that the attorneys' fees, like other items of costs, will be collected either directly from the official, in his official capacity,[7] from funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named party)." 94th Cong. (1976), U.S.Code Cong. & Admin. News, p. 5913.

[7] Proof that an official had acted in bad faith could also render him liable for fees in his individual capacity, under the traditional bad faith standard recognized by the Supreme Court in *Alyeska*. . . ." S.Rep.94–1011 at 5. 94th Cong. (1976), U.S.Code Cong. & Admin.News, p. 5913.

It is obvious, therefore, that Congress did not intend for courts to abandon the "bad faith" requirement of the American common law recognized in *Alyeska* when awarding attorney's fees against officials in their individual capacity.

In *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the Supreme Court had an occasion to consider the legislative history behind 42 U.S.C. § 1988. The Court noted that:

> "The legislative history [of 42 U.S.C. § 1988] makes it clear that in such suits attorney's fee awards should generally be obtained 'either directly from the official in his official capacity, from funds of his agency or under his control, or from the State or local government (whether or

1. 42 U.S.C. § 1988, as amended, states in pertinent part as follows:

"... In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or in any civil action or proceeding, by or on behalf of the United States of

not the agency or government is a named party).' S.Rep.No.94–1011, p. 5 (1976), [U.S.Code Cong. & Admin.News 1976, p. 5913.] *Awards against the official in his individual capacity, in contrast, were not to be affected by the statute;* in injunctive suits they would continue to be awarded only '*under the traditional bad faith standard recognized by the Supreme Court in Alyeska.*' Id., at 5 n. 7, [U.S. Code Cong. & Admin.News 1976, p. 5913.] There is no indication in this case that the named defendants litigated in bad faith before the Court of Appeals. Consequently, the Department of Correction is the entity intended by Congress to bear the burden of the counsel fees award." (Emphasis supplied). 437 U.S. at 700, 98 S.Ct. at 2579, 57 L.Ed.2d at 540.

The majority implies that the court's reference to "injunctive suits" limits the "bad faith standard" to such suits. However, that is not the case. The only reason why the court mentioned injunctive suits was because that was the nature of the lawsuit before it. The *Alyeska* case and the Senate report upon which the Supreme Court in *Hutto* based its conclusion did not limit the bad faith standard to injunctive suits and neither did the court in *Hutto*.

Therefore, it is apparent that Congress did *not* intend to repudiate the "bad faith" standard of American common law as a requirement to awarding attorney's fees against an official in his individual capacity.

In addition to the foregoing, two other circuits and, in at least two instances this circuit, have recognized that a finding of bad faith is a prerequisite to the award of attorney's fees against an official in his individual capacity. The cases are as follows:

(1) *Skehan v. Board of Trustees,* 590 F.2d 470 (3 Cir. 1978). The court citing *Hutto,*

America, to enforce, or charging a violation of a provision of the United States Internal Revenue Code, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

*supra,* held that, based on the trial court's finding of no bad faith, the trial court correctly refused to grant an award of attorney's fees against a college president in his individual capacity. The court stated:

"Thus, the district court's refusal to award fees to Skehan against defendant Nossen in his individual capacity could be affirmed on the basis of the court's factual finding that *the defendants in this case had not pursued their defense in bad faith.*"

. . . . .

"That refusal must be viewed as a valid exercise of the court's discretion under the Act, given its previous determinations that Nossen was officially immune from damage liability and that *he had not pursued his defense in bad faith.*" (Emphasis supplied). 590 F.2d at 495.

(2) *Pickett v. Milam,* 579 F.2d 1118 (8 Cir. 1978). In a suit against election commissioners, the court held:

"We agree with the district court's finding that *there is no indication that the appellees acted in bad faith. Thus, no award of attorney fees against the appellees in their individual capacities is justified. See Hutto v. Finney, supra,* 437 U.S. 678, 98 S.Ct. 2565 at 2579, 57 L.Ed.2d 522. However, the specter of personal liability was removed by the Supreme Court's recent opinion in *Hutto v. Finney, supra.*" (Emphasis supplied). 579 F.2d at 1120.

(3) *Miller v. Carson,* 563 F.2d 741 (5 Cir. 1977): In an action for declaratory and injunctive relief, damages and attorney's fees, this Court approved the award of attorney's fees based on the "bad faith" standard by saying:

"A. The Civil Rights Attorney's Fees Awards Act of 1976

We base our holding that the award was authorized on the Civil Rights Attorney's Fees Awards Act of 1976,[26] Pub.L. 94–559, § 2, Oct. 19, 1976, 90 Stat. 2641, codified at 42 U.S.C. § 1988. That Act provides in relevant part: 'In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

[26] We affirm the trial court's finding that the plaintiffs are entitled to recover an attorney's fee from Sheriff Dale Carson in his individual capacity *on the basis of the bad faith exception to the general rule* that a party must pay his own attorney's fee. *See* 401 F.Supp. at 853–57 . . . .'" (Emphasis supplied). 563 F.2d at 754.

(4) *Morrow v. Dillard,* 580 F.2d 1284 (5 Cir. 1978). While discussing the legislative history behind 42 U.S.C. § 1988, this Court noted:

"The Senate Report [S.Rep.94–1011, 94th Cong., 2nd Sess. (1976)] also indicated that *where a state official was guilty of bad faith,* attorney's fees could be awarded against him in his private capacity under *Alyeska.*" (Emphasis supplied). 580 F.2d at 1299, n. 18.

Furthermore, as a practical matter in the absence of a clear mandate from Congress, the detrimental effects of awarding attorney's fees against an official in his individual capacity in the absence of bad faith should be carefully considered. The possibility of such an award being granted would place an onerous threat and burden on officials in their exercise of the various duties and responsibilities of their offices. Faced with the possibility of having to pay large amounts as attorney's fees for even good faith errors, officials will be timid and reluctant to make even routine decisions. As a result, the efficient administration and management of governmental offices will be adversely affected. The Supreme Court has recognized this undesirable result in at least two recent cases. In *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the court considered the liability of local school officials for their official acts. The court observed that:

"We think there must be a degree of immunity if the work of the schools is to go forward; and, however worded, the immunity must be such that public school officials understand that action taken in

the *good-faith fulfillment of their responsibilities* and *within the bounds of reason* under all the circumstances *will not be punished* and that they need not exercise their discretion with undue timidity." (Emphasis supplied). 420 U.S. at 321, 95 S.Ct. at 1000, 43 L.Ed.2d at 224.

And in *Hutto, supra,* the court recognized that:

> "This [requiring officers to pay attorney's fee awards instead of the state] is manifestly unfair when, as here, the individual officers have no personal interest in the conduct of the State's litigation, and it defies this Court's insistence in a related context that imposing personal liability in the absence of bad faith may cause state officers to 'exercise their discretion with undue timidity.' *Wood v. Strickland,* 420 U.S. 308, 321, 95 S.Ct. 992, [1000] 43 L.Ed.2d 214." 437 U.S. at 699, n. 32, 98 S.Ct. at 2578, n. 32, 57 L.Ed.2d at 540, n. 32.

Based on this rationale of the Supreme Court, it is clear that the Court did not intend that public officials could be "punished" by monetary awards being approved against them in their individual capacities for their official acts when they did not act in bad faith.

In conclusion and in summary, the award of attorney's fees against the officer in this case in his individual capacity, in the absence of a finding of bad faith, is contrary to both the unequivocal expression of Congressional intent and the prior holdings of the Supreme Court and of this and other circuit courts. Therefore, *I would reverse the district court's award of attorney's fees against the Appellant in his individual capacity based on that court's finding that the plaintiff "made no showing that the withholding of plaintiff's letter was done wilfully, with reckless disregard for plaintiff's rights."* [2]

I consider this to be a finding that the Appellant did not act in bad faith. Consequently, the judgment against him in his individual capacity for attorney fees is erroneous.

---

2. In the absence of evidence to the contrary, public officials are presumed to have acted in good faith. *Greenway v. United States,* 175 Ct.Cl. 350 (1966), *cert. denied,* 385 U.S. 881, 87 S.Ct. 167, 17 L.Ed.2d 108 (1966); *Kozak v. United States,* 458 F.2d 39, 198 Ct.Cl. 31 (1972); *Kalvar Corp. v. United States,* 543 F.2d 1298, 211 Ct.Cl. 192 (1976), *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977); *see United States v. Chemical Foundation,* 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131 (1926), and *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944).