654 F.2d 1007
 Evelyn GULLATTE, as Administratrix of the Estate of Robert
Gullatte, Jr., Deceased, Plaintiff-Appellant,
v.
Tom POTTS, Individually and as Warden of Honor Camp Number
Four, et al., Defendants-Appellees,
John Edward Nagle, Individually and as Classification
Officer of the State of Alabama, Department of
Corrections, Defendant-Appellee.
 No. 79-3469.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B
 Aug. 31, 1981.
 Maye, Melton, Kent & Gunter, Michael I. Kent, Opelika, Ala., for plaintiff-appellant.
 Sarah M. Greenhaw, Thomas R. McAlpine, Asst. Attys. Gen., Montgomery, Ala., W. Scears Barnes, Jr., S. Asst. Atty. Gen., Alexandria, Ala., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Alabama.
 Before DYER, TJOFLAT and FAY, Circuit Judges.
 FAY, Circuit Judge:
 
 
 1
 Appellant, Evelyn Gullatte, as Administratrix of the Estate of Robert Gullatte (Gullatte) deceased, sued appellee, John Nagle (Nagle), alleging that Nagle's intentional, wanton, or negligent conduct, resulting in Gullatte's death, was cruel and unusual punishment under the eighth amendment, and thus a violation of the latter's civil rights, 42 U.S.C. § 1983. A hearing was held before a United States Magistrate who, concluding that appellant had failed to prove that Nagle acted intentionally to harm Gullatte, recommended that judgment be entered for appellee. The district court judge, although basing his conclusion on a different legal standard, followed the magistrate's recommendation and dismissed the action. We conclude that, largely as a result of the magistrate's employment of an erroneous legal standard, the findings of fact essential to a proper resolution of this case were not made and, accordingly, we remand for further proceedings consistent with this opinion.[1]
 
 FACTS FOUND BY THE MAGISTRATE
 
 2
 At the time of his death on June 21, 1975, Gullatte was an inmate of the Alabama Penal System, incarcerated at Holman Prison. A graduate of Auburn University and a licensed pharmacist, Gullatte was serving a six year sentence, as a first offender, for violation of the Alabama Uniform Controlled Substance Act. He was scheduled for parole some four months prior to his murder, but that parole was denied.
 
 
 3
 In the early part of 1975, Gullatte was a work-release inmate at the Alexander City Work Release Center, a minimum security institution. As a result of Gullatte's dependence on certain nonprescribed sleeping drugs, he was transferred to the Medical and Diagnostic Center of the Alabama Penal Center at Kilby Prison for evaluation. While at Kilby, Gullatte witnessed the mass homosexual rape of his cell mate. At the request of the Board of Corrections investigator, Gullatte gave a statement as to the identity of the perpetrators and agreed to testify at any future disciplinary hearing against them. By so doing, Gullatte became what is known in prison jargon as a "snitch."
 
 
 4
 On May 29, 1975, Gullatte was reassigned by the Classification Board to Honor Camp Number 4, also a minimum security institution. While at that institution, Gullatte was a source of some irritation to prison officials. Though not a trouble-maker, Gullatte's conduct was a source of some concern. He had difficulty sleeping and wandered through the camp at night, apparently disturbing some of the other prisoners. He was constantly requesting and receiving non-prescription headache medication.
 
 
 5
 On June 16, 1975, Gullatte was returned to Kilby Prison for reassignment. Though it is standard operating procedure to indicate on a form C-51 the reasons for the transfer of a prisoner, there was no such explanation in this case. It was not until ten days after Gullatte's death that Warden Potts prepared a memorandum, at defendant Nagle's request, offering an explanation for the transfer. The memorandum stated the reason as being Gullatte's request that he be moved to an institution in which he could receive medical attention. That explanation is in total conflict with the magistrate's finding that four days prior to his death, and fourteen days prior to the preparation of the memorandum, Gullatte went to speak with Nagle in order to determine why he was being transferred and to request that he be allowed to stay at another road camp or highway patrol station, neither place in which medical treatment was available.
 
 
 6
 On June 19, 1975, the Classification Board, consisting of Nagle,[2] Charles Blackledge, and W. S. Furlow, met to discuss Gullatte's transfer. Gullatte was present and again requested that he be sent to a road camp or highway patrol office. Warden Potts, of Honor Camp Number 4, also had recommended that he be transferred to another minimum security prison. Nonetheless, the Board decided to send Gullatte to Fountain Correctional Center. Fountain has both maximum and minimum security units. The magistrate found that at the time of the transfer all the minimum security slots at Fountain were filled.
 
 
 7
 Shortly after the Board's decision, Nagle met with Isabelle Moore (Moore), a classification officer at Kilby, where Gullatte was then being held. Moore was aware of Gullatte's cooperation in the rape investigation and his resultant "snitch status." She brought this to Nagle's attention and expressed concern that the transfer of Gullatte to a maximum security institution such as Fountain could pose a serious threat to Gullatte's safety.[3] Nagle then authorized Moore to offer Gullatte a choice between being transferred to Fountain or to Holman Prison (Holman), another institution in which prisoners must spend at least an initial period in maximum security. Moore later informed Nagle that, as between Fountain and Holman, Gullatte would prefer Holman. In order to approve the change to Holman, Nagle called Board member Furlow to inform him of Gullatte's selection. Nagle did not tell Furlow that Gullatte was a snitch or that the reason for reconsidering the place of transfer was the possibility that Gullatte's safety could be endangered at certain institutions. Furlow agreed that, on the basis of what he knew, it would be all right to transfer Gullatte to Holman.[4]
 
 
 8
 Gullatte was transferred to Holman on or about June 21, 1975. He was received there as a maximum security prisoner, despite the fact that he was classified as a minimum security prisoner.[5] Gullatte was murdered by other inmates in the maximum security unit the day he was received there.
 
 MAGISTRATE'S PROCEEDINGS
 
 9
 The action was assigned, without objection, to a United States Magistrate for an evidentiary hearing. The hearing was held, during which witnesses were heard and deposition testimony, as well as other evidence, was admitted. At the close of the hearing the Magistrate made certain findings of fact and conclusions of law and recommended that the case against Nagle be dismissed.[6]
 
 
 10
 In addition to the facts previously recited, the magistrate made several significant findings. The magistrate found
 
 
 11
 An inmate who cooperates with prison officials in the investigation of prison crimes or violation of prison regulations is known among the inmates as a "snitch" and is highly disfavored among the general inmate population. This cooperation can result in physical danger or harm to an inmate who has become known as a "snitch". This danger may not only be from the perpetrator of the crime but also from the general inmate population. Prison officials are aware of the probability of the danger to an informer or one who cooperates with the prison officials and will usually attempt to place the inmate informer in protective custody or at an institution where the danger is minimized. Protective custody is confinement in an isolation cell in a maximum security facility.
 
 
 12
 Recommendation of Magistrate at 3-4. The magistrate also found that Gullatte had not expressed fear for his life or safety at anytime, that he had indicated to Moore that he was afraid only of being sent to Fountain, and that he had not provided prison officials with a list of his enemies.
 
 
 13
 On the basis of the facts established, the magistrate was of the opinion that Nagle had not acted so willfully, wantonly, or intentionally with respect to the decision to transfer Gullatte as to violate section 1983. In reading his opinion, as well as the cases cited therein, it is clear that he would have imposed liability only on proof that Nagle intentionally acted to cause Gullatte's injury. Moreover, after having found that prison officials are aware of the great danger faced by snitches placed in the general prison population, the magistrate concluded, "(t)he fact that Nagle had been with the Classification Office less than a month indicates to the Court that he probably did not have a full appreciation at that time of the imminent danger to an inmate known as a 'snitch' or that a known informer would probably be in grave danger at a major institution like Holman." (emphasis added) Recommendation of Magistrate at 12. The magistrate thus indicates that, while prison officials as a whole appreciate the grave danger to snitches, Nagle probably did not appreciate that danger. What the opinion does not determine, however, is the central fact necessary for a resolution of the legal issue presented; namely, what did Nagle know or what should have Nagle known as to the likelihood of Gullatte being injured at Holman or another major institution.
 
 DISTRICT COURT'S OPINION
 
 14
 Subsequent to the magistrate's recommendation, appellant presented to the District Court a list of objections thereto. At the outset the District Court noted that shortly after the magistrate made his recommendation, this Court decided Bogard v. Cook, 586 F.2d 399 (5th Cir. 1978), cert. denied, 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979). In Bogard we set out the legal standards to be applied to a prisoner's action for monetary relief against state prison officials pursuant to section 1983. Because the legal standard that we established in Bogard was substantially different than the actual intent test employed by the magistrate, the district judge was required to apply the facts found by the magistrate to the Bogard standards.
 
 
 15
 The District Court reviewed the record without an evidentiary hearing and, although agreeing with the majority of appellant's objections to the magistrate's recommendation, held that Nagle was entitled to assert his qualified immunity as an effective defense to appellant's claim. In its analysis, however, the District Court failed to distinguish the appellant's proof of a prima facie case from appellee's rebuttal thereof with the qualified immunity affirmative defense. As we will discuss further herein, that is an elusive yet important distinction to draw.
 
 NECESSITY OF A REMAND
 
 16
 Before considering the District Court's opinion, we think it important to indicate that we specifically do not resolve the issue that both parties centered on in their briefs and during oral argument; namely, whether and to what extent a district judge may change or add to a magistrate's findings of fact on questions of credibility without holding an evidentiary hearing. There is no question that the district judge in this case did "correct" some of the magistrate's findings. Those corrections were largely insignificant, technical, and the result of the district judge's correct conclusion that some of the magistrate's findings were totally unsupported by the record and, therefore, clearly erroneous. None of the District Court's changes affect our resolution of this case. On the critical question of credibility the district judge concluded that he must accept the findings of the magistrate.[7] As we will explain, those findings were legally inadequate to allow the District Court to make the proper analysis under Bogard.
 
 
 17
 In Bogard, we clearly enunciated the standard of proof for a prima facie case and the scope of the qualified immunity that would be available to state prison officials sued in their individual capacity under section 1983. Following the Supreme Court's instruction in Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), that the immunity afforded in Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) and Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) was proper, we said that persons seeking to sue state prison officials under section 1983 must prove either that "the official knew or should have known that his action infringed a clearly established constitutional right of the plaintiff," Douthit v. Jones, 619 F.2d 527 (5th Cir. 1980), regardless of the official's subjective intent,[8] Bogard at 411, or that the "official either actually intended to do harm to the plaintiff, or took an action which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result." Bogard at 412. Subsequent decisions of this Court have affirmed those standards and amplified how they should be applied in a wide range of factual contexts. Jones v. Diamond, 636 F.2d 1364 (5th Cir. 1981) (en banc ); Douthit, supra; McNamara v. Moody, 606 F.2d 621 (5th Cir. 1979), cert. denied, 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980); Crowe v. Lucas, 595 F.2d 985 (5th Cir. 1979).
 
 THE OBJECTIVE TEST
 
 18
 In the instant case, neither the magistrate nor the district judge considered whether the objective test of Bogard, that the defendant knew or should have known his actions violated a clearly defined constitutional right, was applicable. While the district judge may have been prevented from making such a thorough analysis as a result of the magistrate's failure to make sufficient findings as to what Nagle knew or should have known of the likelihood of injury to a snitch who is transferred into a maximum security facility, it is nonetheless error that will require consideration on remand.
 
 
 19
 It is well settled and undisputed law that "(a) prisoner has a right to be protected from the constant threat of violence..." 636 F.2d at 1373, citing Withers v. Levine, 615 F.2d 158 (4th Cir.), cert. denied, --- U.S. ----, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980); Gates v. Collier, 501 F.2d 1291 (5th Cir. 1974); Woodhous v. Virginia, 487 F.2d 889 (4th Cir. 1973). "When prison officials have failed to control or separate prisoners who endanger the physical safety of other prisoners and the level of violence becomes so high ... it constitutes cruel and unusual punishment ...." 636 F.2d at 1374, citing McCray v. Sullivan, 509 F.2d 1332 (5th Cir.), cert. denied, 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975); Gates, supra; see, Jones v. Diamond, 636 F.2d 1364, 1374 (5th Cir. 1981) (en banc ). This does not mean that the constitutional rights of inmates are violated every time a prisoner is injured. It would not be reasonable to impose such an absolute and clearly unworkable responsibility on prison officials. When officials are aware of a danger to an inmate's health and safety, however, as appears to be the case when an inmate cooperates with an official prison investigation, it does violate the constitutional proscription against cruel and unusual punishment to fail to afford that inmate reasonable protection.
 
 
 20
 To resolve this issue on remand, the district judge must make specific factual findings as to what Nagle knew or should have known[9] as to the danger to snitches[10] who are placed into the general prison population of a maximum security institution such as Holman.[11] If it is found that Nagle knew or should have known that it posed a danger to snitches to be placed in the general prison population of an institution such as Holman, then the court must determine whether he took reasonable steps to protect Gullatte from that known danger. In that regard it would seem relevant to know whether all minimum security prisoners must initially be placed in the maximum security population during intake at Holman, and if so, did or should Nagle have known that, or whether special arrangements are or could be made for prisoners with particular security problems.[12] If such special arrangements could be made, was or should Nagle have been aware of that fact. These are the types of issues that must be resolved on remand. We hasten to point out, however, that neither the parties nor the court should limit themselves to the areas of inquiry we have suggested. They represent only some of the factors that may be considered in determining whether reasonable steps were taken to protect Gullatte. We would note at this point, however, that we are not in accord with the great weight both the magistrate and the district judge gave to the fact that Gullatte failed to indicate he was in fear of his life or to provide Nagle with a list of potential enemies. While that evidence was admissible, and could even be critical in a case in which only the prisoner was aware of the danger he was in, we do not see that it adds a great deal to this case. If Nagle knew or should have known that Gullatte was in danger, it would not seem to be of great import that Gullatte did or did not confirm that fact. Accordingly, to the extent the court continues, on remand, to give Gullatte's silence such great weight, we would appreciate an explanation of the underlying rationale for so doing.
 
 THE SUBJECTIVE TEST
 
 21
 The other way the plaintiff can establish a prima facie case is to prove that the defendant "either actually intended to do harm to the plaintiff, or took an action which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result." Bogard at 412. Appellant has not contended, nor does the record before us support an inference, that Nagle consciously intended to harm Gullatte. Rather, appellant contends that Nagle was aware, prior to Gullatte's transfer to Holman, that the transfer posed a serious threat to Gullatte's safety and that Nagle's decision to allow the transfer in light of that knowledge demonstrated the type of callousness or conscious indifference to the likely consequences that would satisfy the subjective test of Bogard. On that point, the District Court concluded that Nagle "was not 'so derelict in his duties that he must be treated as if he in fact desired the harmful results' accruing from his actions." Order at 10.
 
 
 22
 There are two factors that require us to reverse and remand, the District Court's conclusion as to the subjective test. As we indicated earlier, neither the magistrate nor the district judge made specific findings as to what Nagle knew about the likelihood of injury to Gullatte at Holman. There is no way the proper analysis can be made under Bogard without that determination. It is not enough to say that prison officials in general are aware of danger to snitches. Neither is it enough to say that Nagle should have been aware or probably was aware that the transfer to Holman posed a serious threat to Gullatte's safety.[13] Unlike the objective test of Bogard, in which it is proper to focus on what Nagle should have known, to satisfy the subjective "conscious indifference" test it is necessary to determine what Nagle did in fact know. On remand, the court is instructed to make such a specific finding.
 
 
 23
 The other problem with the District Court's opinion is that it interprets Bogard unduly restrictively. While it is true that a plaintiff could establish a prima facie case by proving that the defendant was "so derelict in his duties that he must be treated as if he in fact desired the harmful result" that occurred, that is not the only situation that would meet the Bogard test. Subsequent to Bogard, this Court has had numerous opportunities to further explicate the subjective test set out in Bogard. Cruz v. Beto, 603 F.2d 1178 (5th Cir. 1979); Crowe v. Lucas, 595 F.2d 985 (5th Cir. 1979); Fielder v. Bosshard, 590 F.2d 105 (5th Cir. 1979). We said in Fielder :
 
 
 24
 We can divine no real difference between acting with "deliberate" or "callous" indifference and committing acts which are "substantially certain" to harm a prisoner. If the plaintiff establishes the requisite "indifference" and thus establishes liability, then he would also have established the official's "malicious intent" as defined in Wood, thus negating with the same proof the existence of the qualified immunity.
 
 
 25
 590 F.2d at 110. Accordingly, appellant need not show dereliction of duty indicative of actual intent, but could prevail upon proof that Nagle knew of the danger to Gullatte and proceeded with the transfer regardless thereof and without taking proper precautions to protect Gullatte.[14] As with the objective test, the question would be reasonableness of the decision to go ahead with the transfer with the knowledge of the danger. The type of inquiries as to that reasonableness are likely to be similar to those suggested in our earlier discussion of the objective standard. One factual issue that is of concern to us is why Nagle did not explain the reason for the change from Fountain to Holman when he spoke with Furlow for the purpose of obtaining the latter's approval of the change.[15] This is, however, but one of the numerous issues worthy of consideration by the court on remand.
 
 
 26
 THE PRIMA FACIE CASE V. THE QUALIFIED IMMUNITY AFFIRMATIVE DEFENSE
 
 
 27
 In an action such as this there is often confusion between plaintiff's proof of a prima facie case and the defendant's rebuttal thereof with evidence that he is entitled to use his qualified immunity as an affirmative defense to the action. Courts often treat the qualified immunity as a given, rather than the affirmative defense that it is, and place the burden on the plaintiff to overcome the qualified immunity. The reason for this confusion appears to be that the evidence the plaintiff must produce to establish his prima facie case is precisely the type of evidence that makes the defendant's entitlement to the qualified immunity defense less likely. In that sense, the stronger the plaintiff's prima facie case, the less likely that the defendant can come forward with the evidence of good faith needed to establish the qualified immunity. The importance then of the distinction between the prima facie case and the affirmative defense is not the quality of the evidence, but rather the order and purpose for the introduction of the evidence. To establish a prima facie case, for example, the plaintiff must present evidence from which the trier of fact could conclude that the defendant acted in bad faith or in disregard of the plaintiff's constitutional rights. The defendant then has the burden of coming forth with some evidence from which the trier of fact could conclude that the defendant acted in good faith or without malice. But neither party prevails simply by producing sufficient evidence to allow the case to go forward. The party to prevail is the one whose evidence the trier of fact believes is more probable than not.
 
 
 28
 In the present case, it appears that the District Court erred by placing the burden on appellant to disprove the qualified immunity defense, rather than simply requiring that appellant establish a prima facie case. That alone would require that we remand the case. Obviously, on remand the appellant will have the burden of first coming forward with evidence sufficient to establish a prima facie case. Only then will the appellee be required to offer evidence in support of his claim to the qualified immunity.
 
 CONCLUSION
 
 29
 The magistrate in this case applied an incorrect legal standard to the issue presented and, accordingly, failed to make sufficient findings of fact with respect to the proper legal standard of Bogard. The district judge applied Bogard but, left as he was with a cold record and inadequate factual findings, was unable to make the thorough legal analysis required. Additionally, the district judge construed Bogard more narrowly than it should have been construed.
 
 
 30
 Accordingly, we REVERSE the judgment of the District Court and REMAND the action for further proceedings consistent with this opinion.
 
 
 
 [1]
 To avoid a repetition of some of the problems that require this remand, we would recommend that this case be tried in the District Court rather than relying on an evidentiary hearing by a magistrate
 
 
 [2]
 Nagle had been appointed Director of Classifications for the Board of Corrections on May 28, 1975. The magistrate found that Nagle had had some previous experience in the inmate correctional field, but that he had not worked in the area of inmate classification
 
 
 [3]
 The parties hotly dispute whether Moore told Nagle that, as a result of his snitch status, Gullatte was afraid to "go south", a slang term used to refer to Fountain and Holman, or only that he was afraid to go to Fountain. We think the resolution of that issue has only the slightest significance to this case. It does not matter whether Gullatte feared Fountain and Holman or only Fountain. The key fact is that the conversation put Nagle on notice that Gullatte was a snitch, prior to his transfer. If it is found that Nagle knew or should have known of the danger to snitches in all maximum security institutions, it is of no consequence that Gullatte was or was not aware of that fact
 
 
 [4]
 Nagle did not call Board member Blackledge because, having gotten Furlow's vote, he had the two votes required to transfer a prisoner. It is extremely significant to note, however, that Blackledge testified that had he known of Gullatte's status as a snitch he would not have voted to send Gullatte to any of the major institutions. The record does not indicate what Furlow's position would have been had Nagle informed him when he called that Gullatte was a snitch
 
 
 [5]
 Gullatte was received as a maximum security prisoner despite his minimum security classification because it is standard procedure at Holman to initially treat all prisoners as maximum security inmates until there is time to "sort them out" according to classification. The record does not indicate whether exceptions to this general procedure are made for prisoners requiring special medical care or protective custody. This is an area to be explored on remand
 
 
 [6]
 Additionally, the magistrate recommended that the case against certain other defendants be dismissed as well. The district judge did dismiss those other defendants, and the correctness of that ruling has not been appealed
 
 
 [7]
 During oral argument, both parties represented that the District Court had drastically changed the magistrate's finding of fact on questions of credibility, with only the benefit of a cold record. Our review of the District Court's order indicates that he did no such thing. In fact, on the issue so hotly disputed, that is what Moore did or did not tell Nagle about Gullatte's fears, the District Court said, "The magistrate saw and heard the witnesses. The tapes (before the District Court) do not afford the opportunity for personal observation. This court will not disturb the magistrate's findings on this issue." Order at 5
 
 
 [8]
 "Under the objective test of Wood, an official, even if he is acting in the sincere subjective belief that he is doing right, loses his cloak of qualified immunity if his actions contravene 'settled indisputable law.' " Bogard at 411; see Douthit v. Jones, 619 F.2d 527, 533 (5th Cir. 1980) (subjective intent of state official irrelevant under objective test of Bogard and Wood )
 
 
 [9]
 We believe the testimony of Board member Blackledge is relevant to the issue of what Nagle should have known. See note 4 supra
 
 
 [10]
 Under the objective part of the Bogard test the inquiry should be what Nagle knew as to the danger to snitches in general. While his specific knowledge of danger to Gullatte is relevant, it would be enough under the objective test if Nagle knew or should have known that all snitches are in danger from the general prison population, particularly at institutions like Holman and Fountain
 
 
 [11]
 The District Court held that "Nagle was no doubt aware of 'snitches' in the prison system and inmate resentment and efforts of retaliation against them." Order at 9. We cannot tell from this whether the court was making a finding as to what Nagle did in fact know, or merely assuming that Nagle was aware of the facts stated. Were it clearly the former, and were that finding supported by the evidence, we would be inclined to hold that appellant is entitled to a judgment under the objective standard of Bogard. Since we cannot divine the precise meaning of that statement, however, we must remand the case for more specific findings
 
 
 [12]
 The magistrate found that "(p)rison officials are aware of the probability of the danger to an informer or one who cooperates with the prison officials and will usually attempt to place the inmate informer in protective custody or at an institution where the danger is minimized." Recommendation of Magistrate at 3-4. There is no indication if Holman had the capacity to offer such protective custody and, if it did, why Nagle did not have it provided to Gullatte when he was transferred. Additionally, while there was testimony that, at the time of the transfer, the road camps and highway patrol stations were full, the record does not indicate whether consideration was given to opening up a space at one of those places for Gullatte by sending a minimum security prisoner currently in such a place, and who was not in danger as a snitch, to Holman. Given Gullatte's request that he be retained at such a place and Warden Potts' recommendation that he be retained in minimum security, it may be worthwhile to inquire, on remand, why something of that nature was not done
 
 
 [13]
 See note 11 supra
 
 
 [14]
 See note 12 supra and accompanying test
 
 
 [15]
 See note 4 supra